# 24-1409

## United States Court of Appeals
## for the Third Circuit

————————

FRANK HALL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED, PLAINTIFF-APPELLEE,

V.

JOHNSON & JOHNSON, ET AL., DEFENDANTS-APPELLANTS.

————————

On Petition for Permission to Appeal from an Order of the
United States District Court for the District of New Jersey (Quraishi, J.)
Granting Class Certification, No. 3:18-cv-01833-ZNQ-TJB

————————

## OPENING BRIEF FOR DEFENDANTS-APPELLANTS

————————

Kristen R. Seeger
Robert N. Hochman
John M. Skakun III
Neil H. Conrad
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
kseeger@sidley.com

*Counsel for Defendants-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Johnson & Johnson discloses that it does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................i

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ............................................. 6

STATEMENT OF THE ISSUES.............................................. 7

STATEMENT OF RELATED CASES ..................................... 7

STATEMENT OF THE CASE .................................................. 7

      A.    The Initial Securities Fraud Complaint. ...................... 7

      B.    The Talc Product Liability Litigation. ........................... 8

      C.    The December 14, 2018, Reuters Article. .................... 10

      D.    Plaintiff's Amended Securities Fraud Complaint. ...... 12

      E.    The Class Certification Order. ..................................... 15

STANDARD OF REVIEW..................................................... 16

SUMMARY OF ARGUMENT ................................................. 17

ARGUMENT ....................................................................... 18

   I.   The Law Precludes Class Certification When A
      Corrective Disclosure Contains No New Information
      That Reveals The Alleged Fraud........................................... 18

      A.    Securities Class Actions Depend On Price Impact...... 18

      B.    *Goldman* Confirmed That Alleged Corrective
          Disclosures Must Be Scrutinized When Assessing
          Price Impact At Class Certification. ........................... 21

      C.    There Is No Price Impact When An Alleged
          Corrective Disclosure Contains No New,
          Corrective Information. ................................................ 23

D.     Scrutinizing Corrective Disclosures For New, Corrective Information At Class Certification Serves Important Purposes. ..................................27

II.    No Alleged Corrective Disclosure In This Case Can Support Class Certification. ...................................29

A.     The District Court Applied An Erroneous Legal Standard. ...........................................................29

B.     The Record Requires That Class Certification Be Denied............................................................33

1.    The December 2018 Reuters Article Did Not Contain New, Corrective Information. ..............33

2.    The July 2018 *Ingham* Verdict Did Not Contain New, Corrective Information. ..............50

3.    The February 2018 Plaintiffs' Lawyer Advertisements Did Not Contain New, Corrective Information. ......................................54

4.    The January 2018 Law360 Article Did Not Contain New, Corrective Information. ..............56

5.    The September 2017 Plaintiffs' Lawyer Advertisement Did Not Contain New, Corrective Information. ......................................59

CONCLUSION ..........................................................62

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
    623 F. Supp. 3d 470 (E.D. Pa. 2022) ...................................... 30, 31, 32

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) .............................................. 22, 24, 27, 46

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...................................................................... 24, 30

*In re Apache Corp. Sec. Litig.*,
    No. 4:21-cv-00575, 2024 WL 532315 (S.D. Tex. Feb. 9,
    2024) .............................................................................................. 32

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    955 F.3d 254 (2d Cir. 2020), *vacated on other grounds*, 594 U.S.
    113 (2021) ...................................................................................... 26

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .............................................................. *passim*

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) .......................................................... 45

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...................................................................... 29

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ...................................................................... 19

*In re FibroGen Sec. Litig.*,
    No. 21-cv-02623-EMC, 2024 WL 1064665 (N.D. Cal. Mar.
    11, 2024) .................................................................................. 26, 33

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
    97 F.4th 1171 (9th Cir. 2024) ........................................................ 45

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) .................................................................. *passim*

*Gonzalez v. Corning*,
885 F.3d 186 (3d Cir. 2018) ................................................ 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................ 20, 21, 30

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ....................................... 16, 17

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ............................................ 62

*In re LTL Mgmt., LLC*,
64 F.4th 84 (3d Cir. 2023) ....................................... 8, 9, 48

*In re Merck & Co. Sec. Litig.*,
432 F.3d 261 (3rd Cir. 2005) .................................... *passim*

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ...................... 25, 29, 44, 45

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ............................................. 17

*In re Ocugen, Inc. Sec. Litig.*,
No. 23-1570, 2024 WL 1209513 (3d Cir. Mar. 21, 2024) ................... 26

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ............................................. 43

*Pub. Emps.' Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ..................................... 44, 45

*In re Qualcomm Inc. Sec. Litig.*,
No. 17-cv-121-JO-MSB, 2023 WL 2583306 (S.D. Cal. Mar.
20, 2023) .............................................................................. 26

*Ramirez v. Exxon Mobil Corp.*,
  No. 3:16-cv-03111-K, 2023 WL 5415315 (N.D. Tex. Aug.
  21, 2023) .................................................................................... 27

**Statutes, Rules, and Regulations**

Securities Exchange Act of 1934,

15 U.S.C. § 78j(b) ................................................................... 6

15 U.S.C. § 78t(a)) .................................................................. 6

SEC Rule 10b-5,

17 C.F.R. § 240.10b-5 ............................................................ 6

28 U.S.C. § 1292(e) ...................................................................... 7

28 U.S.C. § 1331 ............................................................................ 6

## INTRODUCTION

This case involves securities fraud claims based on a highly public scientific dispute in long-running product liability litigation. Johnson & Johnson has for decades faced allegations that talc in Johnson's Baby Powder contained asbestos and caused cancer. This is false, and J&J has vigorously defended the product liability litigation. It has taken many of these cases to trial and won more than two-thirds of them.

But in recent years some claims have succeeded and produced blockbuster awards, and tens of thousands of product liability cases have been filed as a result of intensive lawyer advertising based on those lottery-ticket verdicts. Seizing on stock price reactions to J&J's litigation risk, and the publicity that product liability lawyers generated to put settlement pressure on J&J, securities fraud plaintiffs' lawyers succeeded in persuading the district court to certify a class.

The ruling is a distortion of both class action and securities law. The key to understanding the district court's errors requires unpacking the law and logic of the presumption of classwide reliance set out in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and more recent Supreme

Court decisions culminating in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021).

The *Basic* presumption requires "price impact": investors can be presumed to rely on an alleged misrepresentation only if it affected the stock's market price. Without price impact, the presumption fails and individual questions of reliance predominate because there is no link between the misrepresentation and the market price paid by investors.

Defendants can rebut the *Basic* presumption by proving a lack of price impact, including through evidence about a plaintiff's alleged "corrective disclosures." A corrective disclosure publicly reveals information that shows an earlier statement was false. Disputes over price impact frequently focus on the alleged corrective disclosures because that is when the stock price drops; in most securities cases, the price does not move at the time of the alleged misstatements. As the Supreme Court recently confirmed in *Goldman*, scrutiny of corrective disclosures tests the essential price impact connection between misrepresentations and the stock price.

For there to be price impact, a corrective disclosure must actually be both "corrective" and a "disclosure." That is, a corrective disclosure

must as a matter of law contain information that (1) is new to the public and (2) reveals the falsity of a prior statement.

The information must be "new" because of the efficient market hypothesis. That theory is the foundation of the *Basic* presumption. It provides that all publicly available information is promptly incorporated into the stock's price, including any misrepresentations and corrections. If information is not new, then it was already incorporated into the price of the stock and its republication cannot affect the stock price. This makes the efficient market hypothesis a double-edged sword for plaintiffs: by invoking the *Basic* presumption, plaintiffs must accept that the market efficiently processes publicly available information related to the alleged fraud. They cannot pick and choose the timing of when such information is incorporated into the price to coincide with a significant stock drop.

The information also must be "corrective" in order to link the alleged fraud and a decline in the stock price. If the disclosure did not reveal the falsity of a prior statement, then it was not related to the fraud and neither was the associated stock drop. Such a mismatch means the stock drop provides no basis for inferring price impact.

The class certification order at issue here erroneously disregarded these two key requirements. Plaintiff's securities claims had survived the motion to dismiss because the complaint alleged that the supposed corrective disclosures included "never-before-seen" internal documents that purportedly contradicted J&J's prior statements in defense of the product liability claims. That is, the complaint pleaded that the documents were both new and corrective. But after exhaustive discovery, the record is clear: each alleged corrective disclosure contains *only* repackaged and previously publicly available information, or information that does not reveal the falsity of any alleged misstatement. Plaintiff's complaint promised "never-before-seen" documents that revealed the alleged fraud, but Plaintiff has failed to deliver.

The district court nonetheless certified all of Plaintiff's corrective disclosures for class treatment. The court held that "the fact that the information was previously made public does not preclude the possibility that any later disclosure of that information could impact a stock's price," contrary to the *Basic* presumption. A96, 100, 104. And, contrary to *Goldman*, the court expressly declined to decide at the class-

certification stage "whether the disclosures are corrective." A101-02.

Both legal propositions are erroneous. Had the proper test been applied,

no claims would have been certified.

Put simply, Plaintiff reversed-engineered this securities fraud

claim. Plaintiff's putative corrective disclosures were chosen, not

because they were revelatory, but because they corresponded to dates

on which J&J's stock price declined by a substantial amount. Three of

the alleged corrective disclosures were authored by product liability

plaintiffs' lawyers and advertised for new plaintiffs. The fourth was a

media report about plaintiffs' lawyers' opening arguments in a trial.

The fifth was a jury verdict after the weeks-long trial had been

broadcast live to the public and received daily news coverage. The last –

the December 14, 2018, Reuters article that is the centerpiece of

Plaintiff's claim for billions of dollars of damages – was admitted to

have been sourced from a leading product liability lawyer, and adopted

the product liability plaintiffs' theories wholesale.

The district court's error incentivizes such reverse-engineering of

securities fraud claims. This is particularly problematic given the trend

in event-driven claims based on mass tort or other underlying litigation.

If corrective disclosures are not rigorously scrutinized for information that is both new and corrective, securities plaintiffs could – as here – assert that companies' attempts to defend themselves were false, and selectively pick "corrective disclosures" from the barrage of plaintiff lawyer client solicitations and from sensationalized but repetitive press coverage. No valid class action or securities law purpose is served by enabling this tactic.

The district court's ruling should be reversed, and this Court should order that this case cannot proceed as a class action because none of the corrective disclosures revealed new corrective information.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because the operative complaint, A169, raises claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The district court entered its class certification order on December 29, 2023. A106. Defendants timely filed a petition pursuant to Federal Rule of Civil Procedure 23(f) and Federal Rule of Appellate Procedure 5 on January 12, 2024. A1. That petition was granted on February 21, 2024.

A108. This Court has appellate jurisdiction under 28 U.S.C. § 1292(e) and Rule 23(f).

## STATEMENT OF THE ISSUES

Whether securities defendants prove a lack of price impact, and so rebut the *Basic* presumption of classwide reliance, by showing that a putative corrective disclosure did not include any new information that revealed the falsity of any alleged misstatement.

## STATEMENT OF RELATED CASES

There are no related cases or proceedings. This case has not been before this Court previously.

## STATEMENT OF THE CASE

### A.    The Initial Securities Fraud Complaint.

The initial complaint in this case, filed on February 8, 2018, alleged securities fraud on behalf of a putative class of investors who purchased J&J stock between February 22, 2013, and February 7, 2018. A136. That complaint alleged that corrective disclosures had revealed that J&J had "known for decades," yet failed to disclose, "that its talc products include asbestos fibers and that the exposure to those fibers can cause ovarian cancer and mesothelioma." A137 ¶ 2, A155 ¶ 59.

**B.    The Talc Product Liability Litigation.**

J&J was embroiled in a highly publicized scientific dispute regarding its talc products long before this securities case. In the 1970s, concerns arose that consumer talc products across the industry were contaminated with asbestos. *See* A194 ¶ 51. Those concerns were aired, investigated, and refuted. But in the last decade, product liability plaintiffs have revived the allegations, and mass tort litigation has proliferated. By April 2020, product liability plaintiffs' lawyers had spent an estimated $63 million on more than 175,000 TV ads touting their allegations. A3534, A3561. By October 2021, more than 38,000 talc lawsuits about J&J products were pending. *See In re LTL Mgmt., LLC*, 64 F.4th 84, 94 (3d Cir. 2023). Tens of thousands more claims have been asserted since.

The plaintiffs (both in the product liability litigation and here) allege a company-wide, decades-long conspiracy. They claim that for many years J&J's consumer talc products contained asbestos, that J&J knew as much, and that J&J intentionally used deficient testing methods and improperly manipulated regulators and scientists to hide the contamination. *See* A1079 ¶ 6; A194-222 ¶¶ 51-102.

8

Ten cases alleging asbestos contamination went to trial before December 13, 2018, the end of the class period, including the *Herford* (10/6/17-11/6/17), *Lanzo* (1/29/18-4/11/18), and *Ingham* (6/6/18-7/12/18) cases. A1079-81 ¶¶ 8-18. *Ingham* produced a $4.69 billion jury verdict, which was later reduced to $2.24 billion following appeal. *See LTL Mgmt.*, 64 F.4th at 94.

The trials were public and closely watched. Most were broadcast live online by Courtroom View Network. A1079-81 ¶¶ 8-10, 12, 14-15, 17. CVN states that its broadcasts are "used by attorneys, corporate counsel, business people, and investors," as well as "insurance companies, well-known journalists, [and] media sites." *See* "About CVN," and "Advertise with CVN," cvn.com.

The product liability litigation against J&J was also widely covered in the press. Between January 2016 and the end of the class period in December 2018, approximately 40,000 articles about the litigation were published by national, local, and legal-industry news organizations. A2288 ¶ 8; A2877-3007 (compilation of press articles). Many of these articles specifically discussed evidence and argument in pretrial proceedings and trials. For example, the St. Louis Record

published 20 articles about the *Ingham* trial as it unfolded, quoting

testimony, discussing documents, and analyzing arguments. A3252-

3499 (compilation of St. Louis Record articles).

Thousands of internal J&J documents produced in the product

liability litigation have also been posted on two public websites:

asbestosandtalc.com and factsabouttalc.com. Asbestosandtalc.com is

run by Dr. David Egilman, an expert witness for product liability

plaintiffs who has testified that he is "doing whatever [he] can to get

[J&J's documents] into the public domain." A3120 at 358:1-14; *see also*

A2290-91 ¶¶ 2-4. Factsabouttalc.com was launched by J&J in 2016 to

provide factual and scientific information in response to the product

liability litigation. A2287 ¶¶ 3-4. The website is the source of many of

the challenged statements in this case. In 2018, J&J updated

factsabouttalc.com to include documents used in the litigation in order

to, as the website says, "invite [consumers] to review the evidence and

make up [their own] mind."

## C.    The December 14, 2018, Reuters Article.

Ten months after the initial securities fraud complaint was filed

in this case, Reuters published an article (comprised of a lead piece and

10

companion piece) about the product liability litigation. A1829-45. Presented under an incendiary headline, the December 14, 2018, article recapitulated the claims of product liability plaintiffs in previous trials, especially *Ingham*. The article asserted that "from at least 1971 to the early 2000s," J&J was aware that its "raw talc and finished powders sometimes tested positive for small amounts of asbestos." A1830. It also claimed that J&J "influence[d] U.S. regulators' plans to limit asbestos in cosmetic talc products and scientific research on the health effects of talc" by hiding test results and advocating for inadequate test methods. *Id.*

The article asserts that it is based on J&J's "internal documents," and that only a "small portion of [them] have been produced at trial and cited in media reports." A1829-30. But as discussed below, a review of every document quoted or linked in the article[1] proved that *all* of them had been previously disclosed. Further, the "primary source" for the article confirmed that everything he provided to Reuters "was publicly available prior to the publication." A5094-95 ¶¶ 3-4.

---

[1] The online version of the Reuters article linked to the documents. *See* reuters.com/investigates/special-report/johnsonandjohnson-cancer.

The article was heavily promoted by Reuters in what amounted to an enormous free marketing campaign for the product liability plaintiffs' bar. The author, Lisa Girion, did multiple promotional TV interviews. A3009-44. In one, she admitted the article was "based entirely" on the J&J documents she cited. A3010-11.

J&J's stock price dropped 10% on December 14, 2018. The "clear consensus" among securities analysts – who had been following the product liability litigation for years – was that the article was "a reiteration of previously disclosed factual issues and public documents from the numerous talc-related litigation matters." A3726 ¶ 150, A3742-46 ¶¶ 182-92. For example, Morgan Stanley reported that "[t]oday's Reuters article did not raise new factual issues but has led to increased awareness around litigation risk" and "may inflate potential legal exposure." A3081. Similarly, J.P. Morgan noted that "all issues reported [in the article] were previously disclosed." A3067.

### D.    Plaintiff's Amended Securities Fraud Complaint.

The initial complaint from February 2018 had identified three corrective disclosures that allegedly "revealed" the "truth" to the public: a September 21, 2017, Bloomberg article; a February 5, 2018, CNBC

article; and a February 7, 2018, press release by a product liability plaintiffs' firm. A155-60 ¶¶ 61-65. Each alleged corrective disclosure concerned the product liability litigation.

On February 28, 2019, Plaintiff amended the complaint, maintaining the same theory of fraud. A176 ¶ 1. However, Plaintiff added four new corrective disclosures, swapped the first one with a product liability plaintiffs' firm's press release from six days later to line up with a stock price decline, and extended the class period to capture the 10% stock drop after the Reuters article. *Id.* ¶ 2, A414 ¶ 421. The amended complaint's six alleged corrective disclosures thus include two press releases by product liability plaintiffs' firms, a blog post funded by a product liability plaintiffs' firm, a Law360 article about opening statements in a product liability trial, the jury verdict in the *Ingham* product liability trial, and the Reuters article. A264 ¶ 184, A269 ¶ 192, A270 ¶ 194, A273 ¶ 201, A279 ¶ 213, A283 ¶ 223; *accord* A5193 ¶ 2. The following table summarizes them:

| Alleged Corrective Disclosures | Date |
|---|---|
| Press release by Bernstein Liebhard firm (replaced September 21, 2017, Bloomberg article) | September 27, 2017 |
| Law360 article (new) | January 30, 2018 |
| Mesothelioma.net post (replaced same-day CNBC article) | February 5, 2018 |
| Press release by Beasley Allen firm (same) | February 7, 2018 |
| *Ingham* verdict (new) | July 12, 2018 |
| Reuters article (new) | December 14, 2018 |

The alleged false statements that survived the motion to dismiss generally represented that J&J's talc products were "asbestos-free" and safe. *See* A519. The district court allowed these claims to proceed to discovery because Plaintiff alleged (and so the court accepted as true) that the corrective disclosures provided "new information" that revealed the falsity of these statements, including that the Reuters article revealed "never-before-seen" internal J&J documents. A514-15, 18.

Class discovery focused on the allegations that Plaintiff's purported corrective disclosures revealed new information that corrected Defendants' statements. In truth, the contents of each disclosure was either previously publicly available, did not reveal the falsity of any challenged statement, or both. Most notably, Defendants

14

traced every document linked or quoted in the Reuters article and proved that each had been publicly available through trials, websites, and press articles before December 2018. *See* A1051-66. The lead trial lawyer in *Ingham*, Mark Lanier, confirmed that he was the "primary source" for the article, and that every document and piece of information he provided to Reuters "was publicly available prior to the publication of the . . . article." A5094-95 ¶¶ 3-4.

Defendants proved the same for the other alleged corrective disclosures. The writer of the Mesothelioma.net blog post, Terri Oppenheimer, acknowledged that it "was based entirely on public information gleaned from conducting internet searches." A5193-94 ¶¶ 3-4. And a principal of the Beasley Allen plaintiffs' firm, Ted Meadows, stated that "[n]one of the statements in the Beasley Allen press release reflected, or were based on, any documents or information that were not publicly available before the publication of the press release." A5203 ¶ 3.

### E.    The Class Certification Order.

Defendants resisted class certification, in relevant part, by arguing that they carried their burden to rebut the *Basic* presumption.

Defendants explained how the supposed corrective disclosures did not contain information that was both new and corrective. The district court concluded that the presumption had not been rebutted and certified Plaintiff's proposed class. A74-105.

The court reasoned repeatedly that "the fact that the information was previously made public does not preclude the possibility that any later disclosure of that information could impact a stock's price." *E.g.,* A96, 100. The court even specifically acknowledged "[i]t is not disputed that the Reuters article references previously disclosed documents." A104. However, the ruling did not explain how its reasoning could be reconciled with the efficient market hypothesis underlying the *Basic* presumption. *See* A92-104. The court also "decline[d] to resolve . . . on this motion for class certification" the dispute over whether alleged corrective disclosures were in fact corrective. A102.

## STANDARD OF REVIEW

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (cleaned up). This "requires a thorough examination of the factual and

legal allegations." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001). "Careful application of Rule 23 accords with the pivotal status of class certification in large-scale litigation, because denying or granting class certification . . . may sound the 'death knell' of the litigation on the part of plaintiffs, or create unwarranted pressure to settle nonmeritorious claims on the part of defendants." *Hydrogen Peroxide*, 552 F.3d at 310 (cleaned up).

This Court reviews "a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Gonzalez v. Corning*, 885 F.3d 186, 192 (3d Cir. 2018) (cleaned up). This Court reviews de novo whether an incorrect legal standard was used. *Id.*

## SUMMARY OF ARGUMENT

The district court erred by granting class certification because the alleged corrective disclosures did not contain information that was both (1) new and (2) corrective. The court concluded that Plaintiff is entitled to the *Basic* classwide presumption of reliance because there can be price impact even when an alleged corrective disclosure merely

rebroadcasted already-public information. That contravenes the efficient market hypothesis that is the foundation of the *Basic* presumption. The district court also certified the class while refusing even to decide whether alleged corrective disclosures were in fact corrective. That contradicts *Goldman*, which held that the issue must be addressed before a class is certified.

When the proper legal standard is applied to the exhaustive record compiled by the parties, the only reasonable conclusion is that each alleged corrective disclosure fails to support a presumption of classwide reliance. The information in each disclosure was not new to the market, was not actually corrective, or both. Defendants have therefore demonstrated a lack of price impact and carried their burden to rebut the *Basic* presumption for each corrective disclosure. The district court's class certification ruling should be reversed.

## ARGUMENT

## I. The Law Precludes Class Certification When A Corrective Disclosure Contains No New Information That Reveals The Alleged Fraud.

### A. Securities Class Actions Depend On Price Impact.

A securities plaintiff "must prove, among other things, a material misrepresentation or omission by the defendant and the plaintiff's

reliance on that misrepresentation or omission." *Goldman*, 594 U.S. at 118. Reliance is crucial because "proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*") (quoting *Basic*, 485 U.S. at 243).

"The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction – e.g., purchasing common stock – based on that specific misrepresentation." *Id.* (cleaned up). Consider a simple example: a public company intentionally overstates profits on an earnings call. Traditionally, class certification would be impossible because the named plaintiff could not prove, with classwide evidence, that every investor who purchased stock on the public market was aware of the statement, let alone bought in reliance on it. In *Basic*, the Supreme Court concluded that "limiting proof of reliance in such a way would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Id.* (cleaned up). Accordingly, *Basic* authorized a shortcut: it held that

plaintiffs may invoke a presumption of reliance based on the "fraud-on-the-market" theory. *Id.* at 811.

"The fundamental premise of the fraud-on-the-market theory . . . is that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of the transaction." *Goldman*, 594 U.S. at 118 (cleaned up). That is, reliance can be presumed on a classwide basis if, and only if, the "misrepresentation (or its correction)" actually impacted the stock price, because all investors rely on the market price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279-80 (2014) ("*Halliburton II*").

"Price impact is thus an essential precondition" for certification of securities fraud claims. *Id.* at 281-82. "*Basic* allows plaintiffs to establish that precondition indirectly" by proving at class certification "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* at 268, 282.

20

**B.   *Goldman* Confirmed That Alleged Corrective Disclosures Must Be Scrutinized When Assessing Price Impact At Class Certification.**

In *Halliburton II*, the Supreme Court held that defendants "must be afforded an opportunity before class certification to defeat the presumption through evidence" of a "lack of price impact." 573 U.S. at 284. "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse" because there is no "link between the alleged misrepresentation and . . . the price." *Id.* at 278, 281.

Efforts to rebut the *Basic* presumption often focus on the alleged revelation of the fraud, i.e., the corrective disclosures. This is because securities plaintiffs typically reason backwards from a drop in the stock price. In most cases, the stock price does not increase at the time of the alleged misstatements; instead, plaintiffs claim the misstatements caused the price to remain at an inflated level. *See Goldman*, 594 U.S. at 123. Plaintiffs point to a later "negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* In such "inflation-maintenance" cases – and this

is one – "price impact is the amount of price inflation maintained by an alleged misrepresentation." *Id.*

Before *Goldman*, there was significant debate about the manner and degree to which courts should scrutinize corrective disclosures at class certification. *See, e.g., In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 608-09 (7th Cir. 2020). *Goldman* put that debate to rest.

The Supreme Court made clear that when "assessing price impact at class certification," courts "must" consider "*all* probative evidence on that question – qualitative as well as quantitative – aided by a good dose of common sense." *Goldman*, 594 U.S. at 122 (cleaned up, quoting *Allstate*). It does not matter "whether the evidence is also relevant to a merits question" like materiality or loss causation; courts "may not use the overlap to refuse to consider the evidence." *Id.* at 122 & n.2 (cleaned up). They cannot refuse "to decide the price impact issue." *Id.* The Supreme Court also expressly stated that analysis of "the contents of the misrepresentation and the corrective disclosure" is relevant to assessing price impact. *Id.* at 123.

### C.    There Is No Price Impact When An Alleged Corrective Disclosure Contains No New, Corrective Information.

An alleged corrective disclosure must be both corrective and a disclosure. That is, it must contain information that reveals a prior statement to have been false (and thus be truly corrective), and the corrective information must be new to the public (and thus be a true disclosure). If securities fraud defendants show that a purported corrective disclosure is in fact not corrective or not a disclosure, then they have demonstrated a lack of price impact and a class may not be certified to seek relief based on that corrective disclosure.

The Supreme Court specifically addressed the requirement that a disclosure be *corrective* in *Goldman*. If defendants show a "mismatch between the contents of the misrepresentation and the corrective disclosure," for example because the misrepresentation is "generic" and the disclosure is "specific," then the inference of price impact "starts to break down." *Goldman*, 594 U.S. at 123. If the mismatch is significant enough – if the disclosure does not actually correct a prior statement – then there can be no price impact. That is because, unless the "disclosure actually corrected the . . . misrepresentation," there is no reason "to infer front-end price inflation – that is, price impact – from

23

the back-end price drop." *Id.* This is what the logic of the *Basic* presumption entails.

The same logic compels the requirement that a corrective disclosure contain *new* corrective information. To invoke the presumption in the first place, plaintiffs must establish "that the stock traded in an efficient market." *Goldman*, 594 U.S. at 118. This is foundational: the presumption and the fraud-on-the-market theory are ultimately "premised on the understanding that in an efficient market, *all* publicly available information is *rapidly* incorporated into, and thus transmitted to investors through, the market price." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (emphasis added); *see also Allstate*, 966 F.3d at 605 ("The *Basic* presumption of reliance is based on the efficient market hypothesis.").

The premise of market efficiency cuts both ways for plaintiffs. It is the mechanism by which information about the alleged fraud becomes incorporated into the stock price, and thus it enables classwide reliance. But if the market is efficient enough to incorporate information about the alleged fraud at the time of the alleged misstatements and at the time of the alleged corrective disclosures (coincidentally, when the stock

24

price fell), then that same market must also be efficient enough to have *already* incorporated *the same information* if it was publicly available before the corrective disclosure. That a plaintiff must, as the Eleventh Circuit put it, "take the bitter with the sweet," is common sense. *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013). If a plaintiff "chooses to embrace the efficient market theory for purposes of proving one element of a § 10(b) claim, he cannot then turn around and contend that the market is not efficient for [other] purposes." *Id.*

Economic experts agree, including both sides' experts in this case. As Plaintiff's expert admitted in his deposition, a purported corrective disclosure that has "no new content, no new information" cannot have price impact because the contents "would already have been incorporated [into the stock price] previously" pursuant to the same efficient market theory that supports the *Basic* presumption. A3812-13 at 65:23-66:6; *see also* A3683-85, ¶¶ 47-50, 3687-91 ¶¶ 56-64 (defendants' expert discussing the relevant academic literature).

This Circuit has previously stated that it "has one of the 'clearest commitments' to the efficient market hypothesis," and has emphasized, albeit in a different procedural context, that securities plaintiffs cannot

"have it both ways" with market efficiency. *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269-70 (3rd Cir. 2005) (affirming dismissal where alleged corrective disclosure was the Wall Street Journal's analysis of previously available information); *see also In re Ocugen, Inc. Sec. Litig.*, No. 23-1570, 2024 WL 1209513, at *3-4 (3d Cir. Mar. 21, 2024) (non-precedential) (affirming dismissal where allegedly corrective information had previously been publicly disclosed). There is no way to both remain committed to the efficient market hypothesis and accept that a corrective disclosure that repeats previously public information may support class certification.

Other courts have already followed the reasoning to its irresistible conclusion for price impact. *See, e.g.*, *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 271 (2d Cir. 2020) (corrective disclosures must "reveal[] *new* . . . information to the market") (emphasis added), *vacated on other grounds*, 594 U.S. 113 (2021); *In re Qualcomm Inc. Sec. Litig.*, No. 17-cv-121-JO-MSB, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023) (no price impact where "there was public information available . . . that mirror[ed] the corrective disclosures"); *In re FibroGen Sec. Litig.*, No. 21-cv-02623-EMC, 2024 WL 1064665, at *12 (N.D. Cal.

26

Mar. 11, 2024) ("[a] finding of 'back-end' price impact requires proof that the information disclosed" is both "corrective" and "new"); *Ramirez v. Exxon Mobil Corp.*, No. 3:16-cv-03111-K, 2023 WL 5415315, at *20 (N.D. Tex. Aug. 21, 2023) (post-*Goldman* ruling that report did "not offer any new corrective information"). This Court should as well.

### D. Scrutinizing Corrective Disclosures For New, Corrective Information At Class Certification Serves Important Purposes.

Insisting that each proposed corrective disclosure contains information that is both new and corrective is crucial. It makes meaningful the Supreme Court's command that defendants are entitled to rebut the *Basic* presumption. Without such scrutiny, the bare fact of a "price *reaction* (the simple movement of the price in response to a given statement)" would effectively swallow "the legal concept of price *impact*." *See Allstate*, 966 F.3d at 612. Allowing this critical distinction to collapse would authorize plaintiffs to point to any statistically significant decline in the stock price, and thereby conclusively establish price impact. Since securities cases are developed by working backwards from significant stock drops, the *Basic* presumption would become all but irrebuttable.

Evaluating alleged corrective disclosures at class certification also reduces the potential for manipulation, particularly in situations where the securities claims piggyback on underlying negative events such as mass tort litigation. In such situations, there will be frequent news articles and plaintiffs' lawyer advertisements, some of which may coincide with movements in the stock price. Securities plaintiffs should not be allowed to cherry pick corrective disclosures based only on the date of stock drops. Nor should they be encouraged to seize upon self-interested and one-sided plaintiffs' lawyers' media strategies as the "revelation" of the "truth," not least because the plaintiffs' bar may intentionally try to cause a stock price reaction. As the *Ingham* lawyer who fed the Reuters article admitted on CNBC four days after its publication, declines in J&J's stock "serve[] [his] purposes as a litigator to say, 'Yes, get their attention; keep driving the stock down'" because that helps him in settlement negotiations. A2991.

The Eleventh Circuit has recognized in a similar context: "If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an

28

analyst's negative analysis of public filings as a corrective disclosure."
*Meyer*, 710 F.3d at 1199. Event-driven securities claims would become a
form of investor insurance. "That cannot be – nor is it – the law." *Id.*; *see
also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (the
securities laws are not designed "to provide investors with broad
insurance against market losses").

## II.    No Alleged Corrective Disclosure In This Case Can Support Class Certification.

### A.    The District Court Applied An Erroneous Legal Standard.

The district court did not apply the rule that there can be no price
impact unless an alleged corrective disclosure contains information that
is both new and corrective. Its ruling reflects two distinct legal errors.
Each one independently warrants vacatur of the order.

1. The court allowed for the possibility of price impact even where
a corrective disclosure contained no new information. It held that "the
fact that the information was previously made public does not preclude
the possibility that any later disclosure of that information could impact
a stock's price." A96, 100; *see also* A104 (That "the disclosure does not
contain any new information may make it less likely that the disclosure

impacted the stock price, but . . . does not suffice to rebut the presumption of price impact.").

The "fact that the information was previously made public" does, as a matter of law, preclude price impact, as explained above. The district court's reasoning necessarily requires believing that the *same information* impacted the price on the date of the corrective disclosure, but did not impact the price for the entire time it was publicly available leading up to the corrective disclosure. This sort of picking-and-choosing "is inconsistent with *Basic*'s own logic." *Halliburton II*, 573 U.S. at 281; *see also Merck*, 432 F.3d at 270. It contravenes the *Basic* "premise[] . . . that in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price." *Amgen*, 568 U.S. at 466.

The district court cited one case to support its conclusion that there can be price impact when a corrective disclosure rebroadcasts already-public information: *Allegheny County Employees' Retirement System v. Energy Transfer LP*, 623 F. Supp. 3d 470 (E.D. Pa. 2022). A95-96. But *Allegheny*'s statements about price impact and re-

publication of a six-day-old article reflect the same error the district court made here.

According to *Allegheny*, even though the republication did not disclose any new information, there was price impact because the republication gave the story "greater significance" and "heighten[ed] awareness" about the issue. 623 F. Supp. 3d at 501. The court did not grapple with the implications of the efficient market hypothesis or cite any authority to support its conclusion. *See id.*

To the extent the market had not incorporated the exact same information from an earlier public article, that suggests that the market was not efficient, so the *Basic* presumption cannot apply. *See Merck*, 432 F.3d at 271 ("An efficient market for good news is an efficient market for bad news."). And to the extent the price reaction may have been driven by "heighten[ed] awareness," that suggests the market was responding to the *fact* of the story rather than any corrective information contained within the story. The market can – and often does – respond to the brand damage or increased litigation or regulatory risk of extended bad publicity about a company. But that does not mean that each repetition of bad publicity is a new revelation of fraud.

Importantly, the certification order in *Allegheny* relied expressly on the coincident fact that state authorities publicly issued a new "stop work" order the day of the stock drop (the next working day after the weekend reprint). *See* 623 F. Supp. 2d at 499-501. That order, the court found, played a significant role in revealing that prior promised construction timelines could not be met for regulatory reasons. *Id.*

2. The district court also refused to decide whether the alleged corrective disclosures actually revealed the falsity of any alleged misstatements. The court stated that "the issue of whether disclosures are corrective is not a proper inquiry at the [class] certification stage," citing a pre-*Goldman* case. A102 (relying on *Erica P. John Fund, Inc. v. Halliburton*, 309 F.R.D. 251 (N.D. Tex. 2015) (remand from *Halliburton II*)). But *Goldman* instructed courts to consider whether "there is a mismatch between the contents of the misrepresentation and the corrective disclosure," and whether the disclosure "actually corrected" the misrepresentation. 594 U.S. at 123. Other courts have recognized this. *See, e.g.*, *In re Apache Corp. Sec. Litig.*, No. 4:21-cv-00575, 2024 WL 532315, at *10 (S.D. Tex. Feb. 9, 2024) (explaining that "a disclosure is considered corrective only when it reveals new facts that

. . . render some aspect of the defendants' prior statement false or misleading" and finding no price impact for three alleged corrective disclosures) (cleaned up); *FibroGen*, 2024 WL 1064665, at *12 (explaining that "revelations that are not 'corrective' cannot form the basis for a corrective disclosure" and finding no price impact for alleged corrective disclosure).

**B.    The Record Requires That Class Certification Be Denied.**

Defendants comprehensively and exhaustively compiled a record that demonstrated that none of the alleged corrective disclosures asserted by Plaintiff contained new information that corrected any alleged misstatement. The Court should order that this case may not proceed as a class action.

**1.    The December 2018 Reuters Article Did Not Contain New, Corrective Information.**

The dispute over price impact for the Reuters article has been a game of whack-a-mole: every time Defendants knocked down one theory, up popped another. Plaintiff argued that Reuters revealed new "never-before-seen-documents"; that it disclosed new "details"; that it contained new "analysis"; and even claimed that the size of the stock drop means there must have been some new information. The district

court referenced Plaintiff's "analysis" theory, but did not make a finding that there was any new, corrective information in the article. A104. The record cannot support such a finding.

### a.    Plaintiff's "Never-Before-Seen-Documents" Theory.

Plaintiff's original contention – the focus of the complaint and the basis for the claims surviving the motion to dismiss – was that the Reuters article "provided never-before-seen internal J&J documents that detailed J&J's knowledge of the asbestos in the Company's talcum powder and J&J's longstanding fraudulent scheme to cover it up." A283-89 ¶¶ 223-32; *see also* A518 (denying motion to dismiss because of allegation that Reuters revealed "never-before-seen internal Company documents that detailed J&J's knowledge").

Defendants disproved this allegation; there were no "never-before-seen documents." Defendants and their expert Allan Kleidon traced every internal J&J document linked or quoted in the Reuters article, and showed they were all publicly available before the article was published. Of those 56 documents, 100% were publicly available from at least one (many from more than one) of the following sources well before the article's December 2018 publication:

- 95% (53 of 56) were used at one or more public trials broadcast on CVN by September 2018.
- 55% (31 of 56) were available on the public website asbestosandtalc.com by August 2018 (and two others were partially available), including the three documents that had not yet been used in a product liability trial.
- 75% (42 of 56) were available on the public website factsabouttalc.com by November 2018.
- 25% (14 of 56) were linked or discussed in public press articles by November 2018.[2]

Further, Reuters's "primary source" – Lanier, the lead plaintiffs' lawyer in the *Ingham* trial – admitted that he supplied the documents to Reuters, and that everything "was publicly available prior to the publication." A5087 ¶¶ 3-4.

An example is illustrative. The complaint claims that Reuters "revealed" an internal, tracked-changes draft of J&J's "Our Safety & Care Commitment" webpage from 2013. A284-85 ¶¶ 224-25; *see also* A1088, Doc. 55; A1096, Row 28; A1818-23. Plaintiff alleges that this

---

[2] Defendants' class certification opposition and expert report describe their methodology and the supporting evidence. A1086-88 (listing all 56 documents in chronological order and the sources they were previously publicly available from); A1090-114 (reproducing the Reuters article in full, identifying every linked or quoted document, listing where each document was previously publicly available, and cross-referencing to Ex. 1); A1115-1827 (compiling all 56 documents, numbered 3.1 through 3.56, in three parts); A3659-794 (Kleidon report, also opining that the documents were public within the meaning of the efficient market hypothesis).

document "contains the admission" that J&J "cannot say 'always' when it comes to asbestos not being in J&J's talcum powder products." A236 ¶ 128, A284 ¶ 224 (cleaned up); *see also* A306-07 ¶ 267, A357-58 ¶ 339, A359 ¶ 342. The document was one of two attachments to the complaint (the other was the Reuters article itself). A430-34.

But this document was plaintiff's exhibit 1 in the *Ingham* trial and a centerpiece of Lanier's argument there. That entire trial was publicly broadcast live on CVN. The June 29, 2018, broadcast included extensive testimony about the document and showed it on the screen:



Gail Ingham, et al. v. Johnson & Johnson, et al.
2018-06-29

Articles about the trial described the document and the testimony in detail, including a July 2, 2018, St. Louis Record piece. A3391-403.

The document was also posted to asbestosandtalc.com no later than August 2018, and to factsabouttalc.com by November 2018. *See* A1096, Row 28. It was not "never-before-seen" prior to the Reuters article.

Plaintiff did not contest Defendants' evidence about the prior public availability of any of the Reuters documents, effectively conceding that the "never-before-seen documents" claim had been disproven. *See* A3906-21. The district court expressly concluded that it "is not disputed that the Reuters article references previously disclosed documents." A104.

### b.    Plaintiff's "Details" Theory.

After its "never-before-seen-documents" theory didn't pan out, Plaintiff pivoted to argue on reply that the Reuters article revealed a hodgepodge of 16 other "details" about J&J's alleged fraud that were new to the public. A4068-71 (chart). Defendants showed that none of these items could support price impact either. A4880-89 (counter-chart responding to all 16 items). The district court did not mention any of these "details," and did not find that any of them were new and corrective. A102-04.

A few examples show why. Plaintiff argued that the Reuters
article disclosed for the first time that "J&J has *never* adopted a
concentration method for preparing talc samples before asbestos
testing." A3906. This was not new: it was a key theme in *Ingham*,
where plaintiffs' counsel argued in open court that J&J "knew about
[concentration testing] for 40 years, 50 years, since the early '70s, but
they refuse to use that test because, quote, that's too sensitive." A4882,
Row 3. Nor was it corrective: J&J never said it used concentration
testing and was not required to.

Plaintiff also pointed to what it called a "court report" stating that
a lab "found asbestos in Shower to Shower talc from the 1990s." A3907.
That "court report" was actually a product liability plaintiffs' expert
declaration that had been publicly filed in 2017. A January 16, 2018,
article by FairWarning discussed that expert declaration and linked to
a copy. A4883, Row 5.

Approximately a third of Plaintiff's new "details" were responses
from third parties to Reuters's inquiries. A4888-89, Rows 11-16. None of
those were new because they merely repeated prior assertions. For
example, a scientist said he "stood by all his findings" from testing talc

in the 1970s, but those findings were publicly disclosed at the time. A4888, Row 12. The then-FDA Commissioner told Reuters that the FDA "recognize[d] the concern" about potential asbestos contamination in consumer talc products and was "look[ing] at how [it] would develop standards for evaluating any potential risk." A4889, Row 14. That had been announced earlier in the year and the FDA had already held a lengthy public symposium on that exact issue in November 2018. *Id.*

Nor did any of these third-party quotes reveal the falsity of anything J&J had said. One quote was by a "former New York City environmental protection chief" who "'recently read that a jury had concluded that Baby Powder was contaminated with asbestos,' [and] said to himself: 'How come it took so long?'" A4888, Row 13. Another was by a product liability plaintiffs' lawyer who "told Reuters that the documents J&J [allegedly] withheld from [his client] would have made a '100% difference' for his client." A4889, Row 15. These personal opinions cannot be corrective disclosures, because they do not reveal any fact that J&J previously concealed and do not match any alleged misstatement.

### c.    Plaintiff's "Analysis" Theory.

Having failed to identify any specific information in the Reuters article that was new and corrective, Plaintiff retreated to generalities. It argued that the article contained new "analysis" and "context," but never articulated precisely what the "analysis" or "context" was. *See* A3906, A3912-13, A3915. The district court referenced this theory, quoting Plaintiff's argument that "'Reuters painstakingly annotated the various documents linked, explaining and providing necessary context.'" A104 (quoting A3915, Plaintiff's reply brief). But the court stopped short of saying that the "context" was in fact new. Nor did it provide any explanation of what "context" was provided. *See* A104.

Product liability plaintiffs had long been pushing their view that there was asbestos in J&J's talc for decades, that generations of J&J employees knew that (but every single one of them hid it), and that J&J's internal documents proved this. The Reuters article "added" only that the Reuters author looked at the evidence and arguments presented in the product liability litigation, and agreed with the plaintiffs rather than J&J. Nothing more.

Product liability plaintiffs had previously presented the theory
that Reuters endorsed in, among others, the trials in *Herford* (began
October 2017), *Lanzo* (began January 2018), and *Ingham* (began June
2018). For example, the *Lanzo* judge concluded that the jury there had
been presented with evidence purportedly showing that: J&J's talc was
contaminated with asbestos for decades; J&J knew and was warned of
this; J&J knew its testing methodology was deficient but chose to use
and publicly support that methodology; and J&J withheld from the FDA
testing results that showed asbestos contamination. A3232-33, A3244.
Further, the plaintiffs' bar had been broadcasting this theory for years
through TV ads and infomercials, social media and blog posts, and press
releases soliciting clients. *See, e.g.,* A3567-69 (Chamber of Commerce
report describing millions of dollars of TV advertising by plaintiffs'
lawyers on talc litigation from 2016-2018); A3630-57 (compilation of
plaintiffs' bar client-solicitation press releases and blog posts about
J&J's alleged knowledge of asbestos contamination).

The principal source for the Reuters article, the lead trial lawyer
for the *Ingham* plaintiffs, put it clearly:

> After it was published, I reviewed the *Reuters* Article and
> recognized my quote in it. I also recognized *all* the information

41

and documents referenced in the *Reuters* Article as materials that I had provided to Ms. Girion [the author]. In my review of the *Reuters* Article, I did not identify *any* references to information or documents that were not part of the public record prior to the publication of the *Reuters* Article.

A5095 ¶ 5 (emphasis added). Reuters simply echoed what the plaintiffs had been saying for years.

Nor was it new for a journalist to side with J&J's opponents and present their theories as the truth. The coverage of the talc litigation was exhaustive. Many articles attributed the claims to the plaintiffs or their lawyers, and sought to provide a reasonably balanced picture of the hotly contested scientific dispute at the core of the litigation.[3] But some reporters adopted the product liability plaintiffs' narrative and presented it as the "truth." One example that is strikingly similar to the Reuters article – but which did *not* coincide with a drop in J&J's stock price – was the January 16, 2018, FairWarning article. That article concluded that internal J&J documents showed that: J&J's talc

---

[3] *See, e.g.*, A2891-93, Daniel Siegal, "J&J's Talc Bore Harmful Asbestos, Calif. Retrial Jury Told," Law360 (Oct. 19, 2017); A2908-10, Daniel Siegal, "J&J Tests Weren't Meant to Find Asbestos in Talc, Jury Told," Law360 (Apr. 3, 2018); A2932-35, Amanda Bronstad, "J&J 'Rigged Tests' on Whether Baby Powder Was Laced With Asbestos, Lanier Tells Jury," National Law Journal (June 6, 2018).

products repeatedly tested positive for asbestos and J&J knew this; J&J tried but failed to remove asbestos from its talc products; J&J knew its chosen testing methodology was not sensitive enough to detect asbestos and it lobbied against more sensitive methodologies; and J&J manipulated scientific and regulatory work related to asbestos in talc. A2412-18.

That's the same "analysis" in the December 2018 Reuters article, and FairWarning even quoted and linked many of the same internal J&J documents Reuters later reused. It's also the same theory presented by the plaintiffs in the *Lanzo* trial at the end of January 2018, two weeks after the FairWarning article. And it's the same theory that was pleaded in the initial securities fraud complaint filed in February 2018.

The Reuters article was merely a "negative journalistic characterization of previously disclosed facts," which "does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010). "[M]ere repackaging of already-public information by an analyst . . . is simply insufficient to constitute a corrective

43

disclosure . . . . After all, if the information relied upon in forming an opinion was previously known to the market, the only thing actually disclosed to the market when the opinion is released *is the opinion itself*, and such an opinion, standing alone, cannot 'reveal to the market the falsity' of a company's prior factual representations." *Meyer*, 710 F.3d at 1199.

The Reuters article is nothing like the rare case where courts have concluded it is plausible that statistical analysis of publicly available raw datasets generated new information that was corrective. The *Amedisys* case is the archetype. There, the Wall Street Journal enlisted an expert "to analyze Medicare records to determine how often between 2005 and 2008 various home health companies sent therapists to patients' homes during a 60 day treatment period and whether such visits coincided with Medicare financial incentives." *Pub. Emps.' Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 318, 323 (5th Cir. 2014). The court concluded that the plaintiff plausibly alleged that the expert's statistical analysis "revealed" something specific and new: a "pattern of home visits clustered around reimbursement targets." *Id.* at 318. At the pleading stage, the court could not say that the pattern had been

previously publicly disclosed in any way that implicates the efficient market hypothesis and the *Basic* presumption. That particular fact – the pattern – was not available from the "raw data" in its "native state" and had never been made public before the article was published. *Id.* at 323; *see also In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1186-87 (9th Cir. 2024) (relying on *Amedisys* to hold that a report plausibly revealed new corrective information where the author collected raw data from the internet using a web archive tool, and then "synthesized" it to determine the number of times a TV show had aired per week, which was not previously known).

Notably, the Eleventh Circuit has concluded that analysis of publicly available information cannot qualify as a corrective disclosure even at the motion to dismiss stage. *Meyer*, 710 F.3d at 1198; *cf. In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795 n.5 (9th Cir. 2020) ("We acknowledge that the Eleventh Circuit has adopted the bright-line rule."). This Court's strong commitment to the efficient market hypothesis may lead it to agree with the Eleventh Circuit. *Cf. Merck*, 432 F.3d at 271 (affirming dismissal of claim where the "reporter simply did the math on June 21; the efficient market hypothesis suggests that

the market made these basic calculations months earlier"). But this case does not force the choice on this Court. Reuters did not analyze data and it did not generate any new insight. It repeated the same theories using the same documents that product liability plaintiffs' lawyers had been loudly trumpeting in public for years. That's not enough even under the contestable theory of *Amedisys*.

### d.    Plaintiff's Stock Drop Theory.

Plaintiff's final argument was that there must have been price impact because J&J's stock price declined 10% the day the Reuters article came out. A3918-21. But "[a] sharp drop in share price alone is not enough for a class to be certified." *Allstate*, 966 F.3d at 605. Plaintiff's reasoning loses sight of the principle that "price *reaction* (the simple movement of the price in response to a given statement) is quite different from the legal concept of price *impact.*" *Id.* at 612. Stock prices may *react* to all sorts of news for all sorts of reasons. But the law does not concern itself with common price fluctuations in equity markets. As relevant here, and as explained at length in Section I, the law demands a particular kind of price movement – what it calls price *impact* – that reflects the incorporation into the stock price of new information that

revealed a prior statement to have been false. To point to the reaction of the market to the publication of the Reuters article, and that reaction alone, sidesteps the entire inquiry.

Moreover, that there was not new corrective information in the Reuters article does not, of course, preclude it from leading to a price reaction. For example, the market may have reacted to the Reuters article itself, and the anticipated consequences of the article on J&J's ongoing litigation expense and exposure, rather than new information *in* it.[4] Defendants' expert Kleidon concluded that is what happened and explained how.

Kleidon started by considering how securities analysts contemporaneously evaluated the stock's movement after the Reuters article. He concluded that the "clear consensus" of securities analysts was that the Reuters article revealed no new information. *See* A3742-46 ¶¶ 182-92; *see also, e.g.*, A3074 (12/14/18 Leerink report: "There was no new information in the Reuters article."); A3081 (12/14/18 Morgan

---

[4] Another possibility is that the market was not efficient, at least regarding information about this issue, at this time. That, of course, would also cause the *Basic* presumption to fail.

Stanley report: "Today's Reuters article did not raise new factual

issues."); A3067 (12/14/18 J.P. Morgan report: "We note that all issues

reported [in the Reuters article] were previously disclosed as part of talc

litigation discovery.").

Instead, securities analysts recognized that the number of product

liability cases could dramatically increase as a result of the article. For

example, one analyst stated that they "expected [the number of

lawsuits] to climb as legal entities pursue additional plaintiffs," and

modeled a scenario where the number of cases increased from "the

current 11,700 claimants" to a "higher claimant count of *100k*." A3055

(12/14/18 Cowen report, emphasis added). Another analyst suggested

that "the current number of cases [could] double" over just the next

year. A3090 (12/14/18 Wells Fargo report); *cf. also* A3533-611 (Chamber

of Commerce report describing the impact of plaintiffs' lawyer

advertising on increasing talc case counts and thereby driving litigation

and settlement costs). These predictions were on target: by October

2021, cases had nearly quadrupled to more than 38,000, *LTL*, 64 F.4th at 94, and current estimates suggest as many as 100,000 claims.[5]

Kleidon explained why the fact *of* the article and its impact was expected to increase case numbers and therefore J&J's litigation costs. *See* A3746-55, -57 ¶¶ 193-213, 218. The article trumpeted the product liability plaintiffs' theories in a one-sided way, under an incendiary headline, and in slanted language. And it was accompanied by a promotional blitz: Reuters released a companion video featuring the author, and she did two live TV interviews during the trading day, plus further appearances in the evening. As a result, the article served as a massive new advertising campaign for product liability plaintiffs' lawyers to recruit new plaintiffs against J&J, and to impact the nationwide jury pool. *See id.* As Kleidon concluded, the market reacted to the likelihood of J&J's increased financial exposure to litigation costs from additional product liability cases. *Id.*

Under Plaintiff's theory, every time a different news organization ran a story on J&J's product liability litigation, that could be a new

---

[5] *See, e.g.,* reuters.com/investigates/special-report/usa-lawsuits-johnson-and-johnson-bankruptcy.

"corrective disclosure," even if the substance had been included in previous stories. Worse, any new advertising by a plaintiffs' lawyer could count too. The more widespread the press coverage of a company, the more opportunities securities plaintiffs' lawyers would have to attach *some* story repeating old information to *some* happenstance drop in the company's stock price. Price reaction would become price impact.

Securities law does not and cannot function that way. Investors who purchase stock in companies subject to long-running, contentious, and high-stakes litigation are not entitled to what amounts to an insurance policy against the market's fluctuations in response to ongoing and disclosed litigation risk. That is especially important because, as the lead plaintiff's lawyer in *Ingham* acknowledged, it is in the product liability bar's interest to generate the kind of coverage that recruits new plaintiffs and "driv[es] the stock down." A5095-96 ¶ 6.

### 2.    The July 2018 *Ingham* Verdict Did Not Contain New, Corrective Information.

Plaintiff alleged that the $4.69 billion jury verdict in *Ingham* announced on July 12, 2018, was new and corrective because it was "the first trial against J&J in which the plaintiffs alleged that their ovarian cancer was caused by asbestos in the talc, rather than by the talc itself."

A279 ¶ 213. The district court certified a class with respect to this alleged corrective disclosure, but its ruling conflated price reaction with price impact.

The *Ingham* verdict itself conveyed no new corrective information. All of the documents, testimony, and argument about J&J, its talc, and asbestos were publicly disclosed – at the latest – during the six-week trial that preceded the verdict. The trial was publicly broadcast "gavel-to-gavel" by CVN. A3677-78 ¶ 33 & n.8, A3719 ¶ 130. Law360, The National Law Journal, Law.com, Bloomberg, and the St. Louis Record, among other media outlets, published stories on a near-daily basis. *See, e.g.,* A2929-67; A3252-499. Plaintiff does not allege there was any market reaction to the public broadcasting of and reporting on the documents, testimony, or argument during the trial. (In contrast, Plaintiff does allege that reporting by Law360 on the opening arguments in the *Lanzo* trial in January 2018 constituted a corrective disclosure, as discussed below.)

The only "new" information contained in the *Ingham* verdict was the fact of the verdict itself: that one particular jury had sided with plaintiffs and awarded an astronomical amount. Any stock price

reaction after the verdict reflected nothing more than the realization of known litigation risk. Before the verdict, the market knew J&J could win or lose the trial based on the publicly available evidence and argument. According to the efficient market hypothesis, the stock price at that time reflected the expected value of the coming verdict. Once the verdict occurred, however, the risk of a loss materialized and was incorporated into the stock price. *See* A3715-24 ¶¶ 119-44 (report by Defendants' expert Kleidon).[6]

That effect on the stock price has nothing to do with new information that corrected prior alleged misstatements. Plaintiff does not allege that Defendants concealed the risk of large adverse verdicts in talc cases – and this was not the first one – so there is no match between the verdict and any alleged misstatement. *See id.* (also discussing J&J's disclosures about risk from the product liability

---

[6] A simplified illustration of how the concept of materialization of the risk works: if publicly available information suggests a 50% risk of a $100 loss, the stock price will incorporate an expected loss of $50. If the risk does not materialize, there will be no loss and the stock will go up to reflect that $50; if the risk does materialize, there will be a $100 loss and the stock will decline to reflect the additional $50 of loss that was not previously priced in. Neither change would imply any inaccuracy in earlier disclosures.

litigation, as well as articles and analyst reports commenting on the litigation risk from *Ingham*); *see also Goldman*, 594 U.S. at 122.

As with the Reuters article, the district court did *not* find that the *Ingham* verdict disclosed any new information about the alleged fraud. A101-02. Instead, the court was "not persuaded that *the verdict* had no impact at all on the stock price." A102 (emphasis changed). The court apparently "agree[d] that the final verdict relates to the information presented at trial," but concluded that this "does not preclude a finding that the announcement of the verdict itself would not [sic] affect J&J's stock price." *Id.* This confuses bare price reaction with legal price impact. *Id.*[7]

Nor did the district court grapple with Plaintiff's cherry-picking of product liability case results. J&J has won most cases that have gone to trial. And of such cases that involve ovarian cancer, *Ingham is the only case J&J has lost*; it has won the other 16 to date, either at trial or on

---

[7] The district court also wrongly decided that there was price reaction even though the stock price movement was not statistically significant at the 95% level. *See* A102. Without statistical significance at the 95% level, there was no generally accepted expert evidence of even the necessary (though not sufficient) condition of price reaction. *See* A3724-25 ¶¶ 145-47.

appeal. Neither Plaintiff nor the district court explained why one outlier jury verdict revealed some "truth," particularly in light of its prejudicial merging of 22 plaintiffs' claims into a single trial.

### 3. The February 2018 Plaintiffs' Lawyer Advertisements Did Not Contain New, Corrective Information.

Plaintiff alleged that a February 7, 2018, press release from the product liability plaintiffs' law firm Beasley Allen was a corrective disclosure because it says the product liability lawsuits were exposing "never-before-seen documents" about asbestos in baby powder. A273-74 ¶ 201. It also alleged that a February 5, 2018, blog post from Mesothelioma.net, a blog sponsored by a product liability plaintiffs' law firm (*see* A5193 ¶ 2), was a corrective disclosure because it states that "experts are anticipating the release of numerous damaging internal company documents" and it references "memos and reports show[ing] that as long ago as the early 1970s, company officials were questioning each other about the impact of asbestos." A270 ¶ 194; *see also* A5205-06 (press release), A5196-5201 (blog post).

Here, too, Defendants proved that there were no never-before-seen documents. A principal at the Beasley Allen law firm testified that

"[n]one of the statements in the Beasley Allen press release reflected, or were based on, any documents or information that were not publicly available before the publication of the press release, whether from having been used in public trials, on J&J's own website, or in other public forms." A5203 ¶ 3. And the writer of the blog post likewise stated that it "describe[d] the then-ongoing trial in *Lanzo*," and "was based entirely on public information gleaned from conducting internet searches" about the trial. A5194 ¶¶ 4-5. In other words, the authors of both alleged corrective disclosures admitted there was no new content.

Beyond applying the wrong standard, the district court also erred by concluding that it was "not persuaded that the February 5 and February 7 disclosures merely 'repackaged' information that was already public." A101. It did not identify any new information in either alleged corrective disclosure. *See id.* Instead, it pointed to three facts that undermine Defendants' position:

> (1) Plaintiff's expert opine[d] that a statistically significant stock price decline followed both disclosures; (2) news media, financial analysts, and J&J's employees' reaction to the disclosures belies any argument that the disclosure was devoid of new information; and (3) Defendants have not offered any other explanation for the stock price drop other than the disclosures.

*Id.* (cleaned up). But these "facts" show nothing more than that there was a price reaction. If the court could not identify any new information in the alleged corrective disclosures, it should not have held there was price impact, regardless of any price reaction.

### 4. The January 2018 Law360 Article Did Not Contain New, Corrective Information.

A January 30, 2018, Law360 article about the *Lanzo* trial was allegedly a corrective disclosure because it reported that plaintiff's counsel said in his opening statement to the jury that (1) "Johnson & Johnson 'got together with other companies that were selling talc and they chose to call the asbestos something else,'" and (2) "Johnson & Johnson . . . [was] aware that talc contained asbestos in the 1970s," based on documents including "a 1975 report." A269 ¶ 192; A3102-03 (article). None of this was new to the public on January 30.

First, the allegation that J&J "got together with other companies that were selling talc and they chose to call the asbestos something else" was made in the *Lanzo* plaintiffs' opening statement the morning of January 29, the day before the alleged corrective disclosure. A2280 at 294:17-22. Not only was that statement publicly recited in open court, the same quote was included in articles published by Law360 and

Law.com on January 29. A2898-907. Plaintiff picked the January 30 Law360 article rather than the January 29 Law360 article, even though both contained the same allegedly corrective quote, because there was a stock drop on January 30 but not January 29.

Second, allegations that J&J has known since the 1970s that its talc products were contaminated with asbestos were heavily publicized long before January 30, 2018. This was the theory of, for example, the *Herford* trial in October and November 2017. A1847-912, A1949-65, A2284-85. It was also presented in the January 16, 2018, FairWarning article, which even referenced a "1975 memo." *See* A2412-19. Also, of course, the plaintiff's lawyer's entire opening argument was made in a public trial that was broadcast live. *See* A2279-82.

The district court acknowledged that "there is an overlap of information published in the [January 30] Law360 article and the two January 29 articles [by Law360 and Law.com]." A99. But it concluded that "one piece of information" was "missing" from the January 29 articles: "the 1975 report." A99-100. Specifically, what was "missing" from the January 29 articles was the following single sentence in the January 30 Law360 article: "For example, an attorney for the plaintiffs,

Moshe Maimon of Levy Konigsberg LLP, on Monday [January 29] cited a 1975 report in which the predecessor company allegedly said it found asbestos in the Johnson & Johnson powder." A3103. That sentence supported price impact, the district court reasoned, because "[e]ven if the Court accepts Defendants' position that statements made during the *Lanzo* trial are public, it does not preclude a finding that an article analyzing the 1975 report a day after the trial could still affect the stock price." A100.

This was the same error yet again: the court ruled that the repetition of already-public information can have price impact. Put aside that the allegedly corrective information was a reference to a 1975 report, not even the document itself. The January 30 article did not reveal any previously concealed fact because it literally summarized the plaintiffs' lawyer's arguments made in open court the day before, which were covered by press reports the day before, and which restated the same theories and claims that had been made by product liability plaintiffs for years. The district court's decision was clearly erroneous.

### 5. The September 2017 Plaintiffs' Lawyer Advertisement Did Not Contain New, Corrective Information.

Finally, Plaintiff contended that a September 27, 2017, press release by the Bernstein Liebhard law firm was a corrective disclosure because it revealed two "newly unsealed documents," and because it "signaled to J&J investors that plaintiffs in ovarian cancer lawsuits throughout the country were looking to add asbestos allegations to their ovarian cancer claims." A264 ¶ 184; *see also* A3097-100 (press release). Defendants proved Plaintiff wrong here, too.

First, the Bernstein press release did not reveal any "newly unsealed documents." Instead, it stated that "*[a]ccording to Bloomberg.com*, the documents were unsealed *earlier [that] month*" in connection with the *Ingham* case. A3098 (emphases added). The Bloomberg article referenced by the press release was titled "J&J Was Alerted to Risk of Asbestos in Talc in '70s, Files Show," and was published six days earlier on September 21 (and was updated on September 22). A2569-76. That Bloomberg article reported on "unsealed documents" purportedly showing "that J&J has known for decades that its talc products include asbestos fibers." A2573. The Bloomberg article

also linked to specific internal J&J documents, including a "1973 report" and a "May 1974 memo." *Compare* A2568-76 *with* A3097-100; *see* A2850-53. Indeed, the initial complaint in this case alleged that the earlier Bloomberg article – *not* the Bernstein press release – was the corrective disclosure for the September 27, 2017, stock drop. *See* A155-58 ¶¶ 61-62. Plaintiff later swapped out the Bloomberg article as a corrective disclosure, replacing it with a better-timed plaintiffs' firm's client solicitation that was expressly derivative of the article.

The district court did not address the new-documents argument for this corrective disclosure. Instead, the court relied on Plaintiff's second theory, concluding that the "Bernstein Release was more than a republication of already known information as it signaled a new development to J&J investors." A97-98. That "new development" was that "plaintiffs in ovarian cancer lawsuits throughout the country were looking to add asbestos allegations." *Id.* This conclusion rests on legal error and a clearly erroneous finding of fact.

Most obviously, this "development" was not corrective because there is no match to any alleged misstatement. Plaintiff does not (and could not) claim J&J concealed that ovarian cancer plaintiffs "planned

to include" asbestos-related claims. *See Goldman*, 594 U.S. at 123. The district court, however, refused to consider this. A97-98.

Plus, this purported "development" was already public before the September 27, 2017, Bernstein release. The September 21, 2017, Bloomberg article was about the pre-trial proceedings in *Ingham*, which Plaintiff's own complaint acknowledges was an ovarian claim premised on asbestos allegations. *See* A279 ¶ 213. And on September 15, 2017, 12 days before the Bernstein release, Bloomberg had published another article, titled "Johnson & Johnson's Newest Talc Problem? Asbestos." A2881-887. That article also described ovarian cancer plaintiffs asserting claims that "some J&J talc products made decades ago were contaminated with asbestos." A2881; *see also* A2877-79 (8/29/17 New Jersey Law Journal article reporting a statement by product liability plaintiffs' counsel that "plaintiffs are currently investigating the link between our clients' ovarian cancers and talcum powder containing asbestos fibers"). That ovarian cancer plaintiffs were adding asbestos contamination claims was not newly revealed to the public by a self-interested press release, expressly labeled "attorney advertising." *See* A3099.

There is a further problem with this corrective disclosure. The vast majority of J&J's stock price decline on September 27, 2017 – 97% – occurred before the Bernstein release. A3705-07 ¶¶ 96-99. Plaintiff and its expert did not dispute this and did not submit any evidence about the remaining $0.04 decline after the release. *See* A3927-28; A3968-70 ¶¶ 74-81. The district court still found price impact. It disregarded the lack of significance – statistical or otherwise – of the $0.04 decline in light of "the information published in the [Bernstein release] and [the fact] that Defendants have not identified another explanation for the price decline." A99. This reasoning makes no sense; there was no price reaction, let alone price impact. *See IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016).

## CONCLUSION

Defendants respectfully request that this Court reverse the district court's decision and hold that Defendants carried their burden to rebut price impact for each alleged corrective disclosure.


Dated: July 26, 2024                    Respectfully submitted,

                                        */s/ Kristen R. Seeger*

                                        Kristen R. Seeger (IL # 6278416)

Robert N. Hochman
John M. Skakun III
Neil H. Conrad
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
kseeger@sidley.com

*Counsel for Defendants-
Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,790 words (as determined by Microsoft Word 365), excluding the parts of the brief exempted by Rule 32(f). This brief also complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced 14-point typeface, Century Schoolbook, using Microsoft Word 365.

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that the text of the electronic version of this brief is identical to the text in the paper copies, and that the electronic version of this document was scanned with Crowdstrike, version 7.05.17706.0, and no viruses were detected.

Date: July 26, 2024

Respectfully submitted,

*/s/ Kristen R. Seeger*

Kristen R. Seeger
Robert N. Hochman
John M. Skakun III
Neil H. Conrad
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

kseeger@sidley.com

*Counsel for Defendants-Appellants*

## <u>CERTIFICATE OF ADMISSION</u>

Pursuant to Third Circuit Local Appellate Rules 28.3(d) and 46.1(e), I certify that I am a member in good standing of the Bar of this Court.

Date: July 26, 2024

Respectfully submitted,

*/s/ Kristen R. Seeger*

Kristen R. Seeger
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
kseeger@sidley.com

*Counsel for Defendants-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

On July 26, 2024, I filed this brief with the Clerk of Court for the

U.S. Court of Appeals for the Third Circuit using the CM/ECF system. I

certify that all participants in the case are Filing Users and that service

will be accomplished electronically by the Notice of Docket Activity in

accordance with Third Circuit Local Appellate Rule 113.4.

Date: July 26, 2024                          Respectfully submitted,

*/s/ Kristen R. Seeger*

Kristen R. Seeger
Robert N. Hochman
John M. Skakun III
Neil H. Conrad
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
kseeger@sidley.com

*Counsel for Defendants-Appellants*