No. 24-1409

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

FRANK HALL, Individually and on Behalf of All Others Similarly Situated,

*Plaintiff-Appellee*,

vs.

JOHNSON & JOHNSON, et al.,

*Defendants-Appellants*.

On Petition for Permission to Appeal from an Order of the
United States District Court for the District of New Jersey (Quraishi, J.)
Granting Class Certification, No. 3:18-cv-01833-ZNQ-TJB

PLAINTIFF-APPELLEE'S ANSWERING BRIEF

ROBBINS GELLER RUDMAN
  & DOWD LLP
JOSEPH D. DALEY
HARINI P. RAGHUPATHI
655 West Broadway, Suite 1900
San Diego, CA 92101

CARELLA, BYRNE, CECCHI,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ 07068

*Lead Counsel for Plaintiff-Appellee San Diego County Employees Retirement*
*Association and Lead Counsel for the Class*

**United States Court of Appeals for the Third Circuit**

**<u>Corporate Disclosure Statement and</u>**
**<u>Statement of Financial Interest</u>**

No. <u>24-1409</u>

Frank Hall, Individually and on Behalf of All Others Similarly
Situated

v.

Johnson & Johnson, et al.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Plaintiff-Appellee San Diego County Employees Retirement Association

(Name of Party)

    1) For non-governmental corporate parties please list all parent corporations: N/A

    2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

N/A

    3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

    4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

s/Joseph D. Daley

(Signature of Counsel or Party)

Dated: September 9, 2024

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................1

II.   COUNTERSTATEMENT OF ISSUES PRESENTED ...................3

III.  STATEMENT OF RELATED CASES............................................3

IV.  COUNTERSTATEMENT OF THE CASE ...................................3

     A.    Factual Background..............................................................3

          1.    The underlying securities-fraud action revolves around Defendants' fraudulent denials of a terrifying reality: known (but undisclosed) asbestos contamination in J&J's flagship talc and powder products. ......................................................................3

          2.    Among the various truthful disclosures informing investors of Defendants' fraud, a blockbuster *Reuters* exposé reveals new information and spurs a 10% plunge in J&J's stock price. ..........................................9

     B.    Key Procedural Events .......................................................16

          1.    The district court denies most of Defendants' motion-to-dismiss arguments. ..............................................16

          2.    The class-certification Opinion reflects the district court's discretionary findings and conclusions after considering extensive briefing, copious record evidence, and opinions from the parties' dueling experts. ........................................................................18

V.   STANDARD OF REVIEW .........................................................21

VI.  SUMMARY OF ARGUMENT....................................................22

VII. ARGUMENT...............................................................................26

**Page**

A.    Utilizing its findings that corrective information helped reveal Defendants' fraud to the market, the district court acted well within its discretion in holding that Defendants failed to carry their burden of disproving price impact. ....................26

1.    Defendants have conjured up a false premise by claiming that *Goldman Sachs* requires corrective disclosures to be "new" when assessing price impact. .............27

2.    Indulging Defendants' made-up premise, the *Reuters* Report contained new information that, when disclosed, contributed to J&J's plummeting stock price. ........................................................................29

3.    The *Ingham* verdict obviously impacted J&J's stock price, and Defendants failed to prove otherwise ......................40

B.    Defendants' price-impact arguments actually are thinly-veiled loss-causation and truth-on-the-market arguments— both "merits" inquiries that are not properly adjudicated at the class-certification stage. .................................................42

1.    Defendants' loss-causation defense cannot be decided at the class-certification stage. ...................................................42

2.    Defendants' truth-on-the-market defense cannot be decided at the class-certification stage ......................................47

C.    This Court may affirm the class-certification decision on myriad grounds contained in the record. .............................................50

VIII.   CONCLUSION ...............................................................................55

4861-2289-8401.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) ................................................................38

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)................................................................*passim*

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................*passim*

*Dirks v. SEC*,
463 U.S. 646 (1983)................................................................34, 54

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................42

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)................................................................*passim*

*Erie Telecomm., Inc. v. City of Erie*,
853 F.2d 1084 (3d Cir. 1988) ................................................51, 55

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ............................................45

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021)................................................................*passim*

*Grandalski v. Quest Diagnostics Inc.*,
767 F.3d 175 (3d Cir. 2014) ................................................22, 40, 41

*Guthrie v. Lady Jane Collieries, Inc.*,
722 F.2d 1141 (3d Cir. 1983) ................................................51

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)................................................................*passim*

**Page**

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ............................................................38

*Helvering v. Gowran*,
    302 U.S. 238 (1937)............................................................25, 50

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ............................................31, 32

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
    97 F.4th 1171 (9th Cir. 2024) ............................................31, 32, 47

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ............................................................46

*In re Ocugen, Inc. Sec. Litig.*,
    2024 WL 1209513 (3d Cir. Mar. 21, 2024)........................................46

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ............................................................45

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ........................................................46

*Pub. Emps.' Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ............................................31, 32, 47

*Vizirgianakis v. Aeterna Zentaris, Inc.*,
    775 F. App'x 51 (3d Cir. 2019) ........................................22, 41

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
    §78j(b)..............................................................................16

17 C.F.R.
    §240.10b-5 ........................................................................16

- iv -

**Page**

Federal Rules of Civil Procedure
  Rule 23 ...................................................................................................18

## SECONDARY AUTHORITIES

Investopedia, https://www.investopedia.com/articles/investing/052815/financial-
  news-comparison-bloomberg-vs-reuters.asp (visited Sept. 6, 2024) ...................9

## I.    INTRODUCTION

This securities-fraud appeal concerns the singular issue of "price impact" as it relates to: (i) Defendants' repeated denials of asbestos contamination in Johnson & Johnson's talc and powder products, including their repeated false assurances that "our talc products are, *and always have been*, free of asbestos"[1]; and (ii) truthful disclosures during the Class Period that revealed Defendants' perfidy while driving down J&J's stock price.

As the district court explained in its class-certification Opinion, because Plaintiff "established a rebuttable presumption of reliance" pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), Defendants assumed the burden of persuasion to rebut that presumption by *disproving* price impact by a preponderance of the evidence. A0094; *see Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 117 (2021); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281 (2014) ("*Halliburton II*") (defendants must "'sever[] the link'" between their misrepresentations and stock-price impact).  Based upon precedent, a fulsome record, and thousands of pages of briefing and exhibits—including dueling expert opinions— the court concluded that Defendants did not satisfy that burden and so certified the

---

[1] (A0263-A0264:¶183) (some emphasis in original).  Throughout this Brief, emphasis is added and internal citations/footnotes are omitted unless otherwise indicated.

class.  A0097-A0104; *see*, *e.g.*, A0104 ("Having reviewed *all of the evidence* surrounding the December 14, 2018, disclosure, the Court concludes that Defendants have not rebutted the presumption.").

The overriding premise of Defendants' argument, both below and again on appeal, is that each of the six "corrective disclosures" that impacted J&J's stock price and drove it downward via statistically significant drops was composed entirely of stale, previously-aired information of which the market was fully aware.  *See* Defs' Brf. at 18-62.  In Defendants' view, for the purposes of price impact *any* corrective disclosures must be composed of brand-spanking-new facts, never before aired in any fora—no matter how obscure the location or incomplete the prior airing.

The purported source of Defendants' "newness" prerequisite for price impact is *Goldman Sachs*, 594 U.S. 113.  But this Court will see that Defendants are mistaken— for while *Goldman Sachs* dealt at length with price impact, it is utterly silent as to Defendants' "newness" criterion that they have created out of whole cloth.

Aside from their baseless construction of an additional price-impact prerequisite, Defendants commit two more errors while focusing on whether the corrective information was 100% "new" and "corrective": first, they fail to *prove* that the corrective disclosures did not reveal *any* "new" information; and second, they improperly raise merits arguments concerning the concepts of "loss causation" and

- 2 -

"truth-on-the-market"—neither of which, according to the Supreme Court, is properly adjudicated at the class-certification stage.

The district court's discretionary class-certification conclusion should stand.

## II.    COUNTERSTATEMENT OF ISSUES PRESENTED

Whether the district court acted within its discretion when it certified the class and held, based upon abundant record evidence, that: (i) several corrective disclosures communicated "new" information about Defendants' fraud to J&J investors; and (ii) Defendants failed to carry their burden of disproving any corresponding price impact by a preponderance of the evidence.

## III.    STATEMENT OF RELATED CASES

Plaintiff is unaware of any related cases or proceedings.  This case has not been before this Court previously.

## IV.    COUNTERSTATEMENT OF THE CASE

### A.    Factual Background

**1.    The underlying securities-fraud action revolves around Defendants' fraudulent denials of a terrifying reality: known (but undisclosed) asbestos contamination in J&J's flagship talc and powder products.**

J&J develops, manufactures, and sells healthcare products.  A0184:¶20. Among them is J&J's self-described "'flagship product'" and "'sacred cow'"— Johnson's Baby Powder.  A0190-A0191:¶43.  Debuting in the early 1890s, Johnson's

- 3 -

Baby Powder eventually became, in J&J's words, "one of the most familiar and trusted products in the world."  A0191:¶44.

But that trust was misplaced.

Beginning in the late 1960s, J&J insiders privately acknowledged that some of the Company's talc and powder products contained trace amounts of *asbestos*— fibrous minerals known to cause cancers.[2]  *See, e.g.*, A0195-A0196:¶52 (1969 internal J&J memorandum flagging concerns about "adverse effects on the lungs of babies or mothers," while admitting that J&J's talc contained "unavoidable trace amounts" of tremolite); *see also* A0197:¶55 (July 1971 internal memorandum noting J&J Baby Powder's talc came from a Vermont mine containing "trace amounts of fibrous minerals," and that three independent labs had concluded that even after a "washing process" the talc still contained "traces of fibrous minerals").  Outside test results shared with J&J reflected the same conclusion.  *See, e.g.*, A0197-A0198:¶56 (University of Minnesota professor Thomas Hutchinson tests J&J talcum powder samples in 1972 and finds chrysotile in Shower to Shower talcum product); *see also*

---

[2]  "Asbestos" is the commercial term used to describe certain minerals that develop naturally as bundles of long, thin fibers.  A0193-A0194:¶50.  Among them are chrysotile, tremolite asbestos, actinolite asbestos, anthophyllite asbestos, amosite, and crocidolite.  *Id.*

A0198:¶57 (J&J informed that a Sperry Rand outside lab had detected asbestos fibers in Shower to Shower).

That undisclosed reality was potentially devastating for J&J, as even mere trace amounts of asbestos fibers—invisible without sophisticated detection methods and equipment—are considered dangerous to humans.  A0193-A0194:¶50.  Indeed, the federal government has made clear that there is *no* known safe level of exposure to asbestos.  *Id*.

Instead of coming clean with consumers and J&J investors, however, J&J engaged in a decades-long campaign of deceit—doubling down on denials of *any* asbestos contamination in its talc and powder products.

For instance, a June 1971 J&J press release stated flatly that after 50 years of research, "there is no asbestos contained in the powder manufactured by Johnson & Johnson."  A0196-A0197:¶54.  When J&J submitted test results to the FDA that it claimed "clearly" showed "no chrysotile asbestos," the Company didn't acknowledge Professor Hutchinson's contrary findings about the Shower to Shower product. A0197-A0198:¶56.  And when the Dutch Consumer Organization told J&J in 1973 that it had found asbestos in Johnson's Baby Powder, J&J disputed the Organization's testing methods and asked it not to publicize the news "before we agreed with their findings."  A0199-A0200:¶59.

- 5 -

J&J took other measures, as well. It embarked on a campaign to undermine scrutiny by public health officials and doctors, who were branded internally as "Antagonistic Personalities." A0200-A0201:¶61. In addition, J&J purposefully avoided using more-stringent—but essential—testing methods on its talc (A0201-A0204:¶¶63-67), and instituted a self-serving "talc safety defense program" whose favorable results were disseminated to medical communities. A0205-A0206:¶71. A 1977 status report on those efforts crowed that "favorable data from the various J&J sponsored studies have been disseminated effectively to the scientific and medical communities" in both the United States and the United Kingdom. *Id.*

Altogether, from at least 1971 to the 2000s, J&J's raw talc and finished powders repeatedly tested positive for asbestos—with Company executives, mine managers, scientists, and lawyers privately discussing the contamination. A0177-A0178:¶4. But J&J kept that same fact hidden from regulators and the public. *Id.*

In 2013, J&J began defending itself against product-liability lawsuits alleging that its Baby Powder and Shower to Shower products had contributed to the plaintiffs' ovarian cancer. A0232-A0233:¶120. While the allegations (initially) centered on the talc itself, Defendants knew that those products were contaminated with asbestos— and so began lobbing a series of misstatements aimed at preserving the public trust and preventing discovery of J&J's longstanding misinformation campaign aimed at

- 6 -

researchers and regulators. *Id*. Defendants' misstatements flowed during the Class Period spanning February 22, 2013 through December 13, 2018, and included the following:

- In late 2013, on a J&J website entitled "Our Safety & Care Commitment," Defendants claimed that J&J's cosmetic talc had "a long history of safe use" after being "used for over 100 years"—even though an internal markup of the same statements had crossed out the adjective "safe," and questioned the "100 years" claim;[3] and that

- J&J's "talc is carefully selected, processed and tested to ensure that [it] is *asbestos free*"—after Company insiders privately warned in the markup that "*we cannot say 'always'*[] asbestos free."[4]

Despite the warnings from J&J insiders, including Defendant Carol Goodrich, that the Company *could not say* that its talc products had "*always*" been "asbestos free," Defendants did precisely that throughout the Class Period. Indeed, on multiple occasions during the Class Period, Defendants falsely assured the public that "our talc products are, *and always have been*, free of asbestos." A0263-A0264:¶183, A0272-A0273:¶200, A0357-A0358:¶339, A0364:¶350.

Following a February 2016 $72 million personal-injury award involving J&J talc products and ovarian cancer, the Company continued its deceptive scheme by adding a page to its website denying any asbestos contamination. A0246-

---

[3]    A0235-A0237:¶¶126-128.

[4]    *Id*.; *see also* A0430.

A0247:¶148.   Entitled "The Facts About Talc Safety," the page falsely and/or

misleadingly claimed that:

- "JOHNSON's talc products do not contain asbestos."

- It is a "misperception ... that JOHNSON's Baby Powder contains talc made with asbestos."

- "Since the 1970s, talc used in consumer products has been required to be asbestos-free."

- "The grade of talc used in cosmetics is of high purity ... and is free from asbestos and asbestiform fibers."

- "Cosmetic grade talc is only mined from select deposits from certified locations .... [and] is ... milled to relatively large, non-respirable particles size."

- "Our sources for talc undergo comprehensive qualification."

- "The incoming talc is routinely evaluated ...."

- "The incoming talc is ... evaluated using a sophisticated battery of tests designed to ensure quality, safety, and compliance with all global standards."

- "The safety of talc is based on a long history of safe use and decades of research by independent researchers and scientific review boards."

*Id*. (alteration in original).

Throughout the Class Period, Defendants echoed these and other similar

misstatements in other fora.  *See, e.g.*, A0248-A0249:¶151 (J&J falsely tells FDA in

March 2016 letter that "[n]o asbestos-form structures have ever been found during any

testing" of J&J Body Powders); A0253:¶163 (Defendant Glasgow boasts in June 2016

*Houston Chronicle* editorial about J&J talc's "purity" and insists that it is "asbestos-free," as "confirmed ... with regular testing since the 1970s"); A0263-A0264:¶183 (September 21, 2017 assertion in *Bloomberg* article that "the FDA, numerous independent laboratories, and numerous independent scientists have *all* confirmed the absence of asbestos in our talc products").

As would soon become apparent, these reassurances directed at consumers and J&J investors were false and misleading.

> **2.    Among the various truthful disclosures informing investors of Defendants' fraud, a blockbuster *Reuters* exposé reveals new information and spurs a 10% plunge in J&J's stock price.**

A series of six partial disclosures revealed to the market the relevant truth about Defendants' misstatements and misconduct concerning asbestos contamination in J&J's talc and powders, triggering statistically significant stock drops.  Among the six—and marking the Class Period's end—was a December 14, 2018 investigative report by respected media outlet *Reuters*.[5]  Because that Report is at the heart of the

---

[5]   *Reuters* is widely regarded as one of the "fastest and most credible digital information sources in the financial industry."  *See* Mark Kolakowski, *Bloomberg vs. Reuters:    What's    the    Difference?*,    Investopedia, https://www.investopedia.com/articles/investing/052815/financial-news-comparison-bloomberg-vs-reuters.asp (visited Sept. 6, 2024).

underlying matter, and takes up the lion's share of Defendants' appellate arguments (*see* Defs' Brf. at 33-50), Plaintiff features it here.[6]

Entitled "*Powder Keg: Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder*," the *Reuters* Report directly refuted Defendants' false statements while utilizing formerly private information and internal J&J documents detailing both J&J's knowledge of the asbestos in the Company's talcum powder as well as the longstanding scheme to keep that hidden. A0283-A0284:¶223. *Reuters* explained that the documents existed—but had not been made public—back in 1999 when J&J successfully avoided "handing over talc test results and other internal

---

[6]    Distilled, the remaining five disclosure events that triggered statistically significant J&J stock drops included: (1) a September 27, 2017 law firm press release explaining that plaintiffs in ovarian-cancer lawsuits were looking to add asbestos allegations to their existing cancer claims against J&J (A0264:¶184); (2) on January 30, 2018 the legal website Law360 reported that a jury in the *Lanzo* mesothelioma personal-injury trial was told that: (i) J&J *had* known by the 1970s that its talc contained asbestos; and (ii) a 1975 report contained allegations that another company had found asbestos in J&J powder (A0269:¶192); (3) on February 5, 2018, the website Mesothelioma.net posted a report that "experts are anticipating the release of numerous damaging internal company documents" that would undermine J&J's trial assertion that "their product has always been completely asbestos free" (A0270:¶¶194-195); (4) two days later a law firm press release noted that "new" documents unearthed in various J&J product-liability trials "highlight[ed] the links between talc, asbestos, heavy metals and cancer [that] continue to surface," and that "more hidden information" was coming out (A0273-A0274:¶201); and (5) on July 12, 2018, J&J suffered a $4.69 billion verdict in the *Ingham* personal-injury trial; notably, that was the first trial in which plaintiffs alleged that *asbestos in the talc*, rather than the talc itself, had caused their ovarian cancer. A0279:¶213.

- 10 -

company records" to a cancer-stricken plaintiff named Darlene Coker who claimed "'poisonous talc'" in Johnson's Baby Powder had caused her mesothelioma.  A1829-A1830.  Coker had to abandon her lawsuit when her discovery demands were stymied.  *Id*.

Fast-forward to 2018.  With J&J now facing lawsuits by some 11,700 plaintiffs claiming J&J talc had caused their cancers, an enormous trove of internal documents was finally becoming public.  *See* A1830 ("[t]wo decades later," the information that J&J had kept from Coker and her attorney "is emerging as J&J has been compelled to share thousands of pages of company memos, internal reports and other confidential documents" with plaintiffs' attorneys).  *Reuters*'s summary of its investigation of the documents' contents was stunning:

> A *Reuters* examination of many of those [thousands of J&J] documents, as well as deposition and trial testimony, shows that *from at least 1971 to the early 2000s, the company's raw talc and finished powders sometimes tested positive for small amounts of asbestos, and that company executives, mine managers, scientists, doctors and lawyers fretted over the problem and how to address it while failing to disclose it to regulators or the public*.

*Id*.

*Reuters* also explained that the documents showed J&J's deliberate efforts to hoodwink regulators, for they

> also depict *successful efforts to influence U.S. regulators' plans to limit asbestos in cosmetic talc products and scientific research on the health effects of talc*.

- 11 -

*Id*.

*Reuters* further reported that:

- Dr. Arthur Langer, a mineralogist who had found asbestos in Johnson's Baby Powder, told *Reuters* he was visited by J&J lawyers in 2017 (during the Class Period), and told them "that he stood by all of his findings." A1837;

- J&J's lawyer told *Reuters* that even today, J&J's X-ray scanning for asbestos testing can only "detect suspect minerals at levels as low as 0.1 percent." A1840;

- Jerome Kretchmer, former New York City environmental protection chief, told *Reuters* that when he "recently read that a jury had concluded that Baby Powder was contaminated with asbestos," he said to himself: "'How come it took so long?'" A1837;

- Then-FDA Commissioner Scott Gottlieb told *Reuters* that he "'recognize[s] the concern'" about talc and that "the agency's policing of cosmetics in general—with fewer than 30 people regulating a 'vast' industry—was 'a place where we think we can be doing more.'" A1841;

- *Reuters* highlighted in bold, large font the fact that "J&J didn't tell the FDA that at least three tests by three different labs from 1972 to 1975 had found asbestos in its talc—in one case at levels reported as 'rather high.'" A1830;

- *Reuters* reported that J&J "never adopted" a concentration method so that "samples [would] be concentrated before examination under a microscope" (A1840), even after J&J's outside expert told the Company that such a method was "considered essential" (A0201-A0202:¶63); and

- Digging in deeper, *Reuters* explained that while J&J had claimed in a submission to the FDA that outside labs hadn't found asbestos in tested samples, the Company's submission "*left out* University of Minnesota professor Thomas E. Hutchinson's finding of chrysotile in a Shower to Shower sample—'incontrovertible asbestos,' as he described it in a lab note." A1837.

4861-2289-8401.v1

*Reuters* made clear that its Report contained new information and analysis—noting that only "[a] small portion of the documents have been produced at trial and cited in media reports" previously.  A1830.  As for the remainder, "[m]any were shielded from public view by court orders that allowed J&J to turn over thousands of documents it designated as confidential." *Id*.  Thanks to *Reuters*'s sleuthing, however, "*[m]uch of their contents is reported here for the first time*." *Id*.

The fallout from the *Reuters* exposé was enormous, as J&J's stock plunged 10% and erased nearly $40 billion in market value in a single day.  A0181-A0182:¶12; A0289:¶233.  Beyond the multi-billion-dollar stock drop, the new information triggered additional reactions—both private and public.

Privately, the *Reuters* revelations spurred actions inside J&J.  The Company mobilized a team of lawyers and executives to respond to the news, while earmarking an $8 million increase to its media budget.  A3909; A4278.  An internal memo to J&J's Executive Committee admitted the article's stock-price impact: the "article published by Reuters on Talcum powder led to a 10% stock decline and a $40 billion market cap loss." A4307.  J&J even changed its messaging on asbestos in the article's wake: the Company tweaked its "What we knew" advertisement that formerly had insisted its Baby Powder "*never*" contained asbestos—now carefully stating that J&J's Baby Powder "*does not*" contain asbestos.  A4498/181:24-A4499/185:6.

Publicly, financial analysts and commentators covering J&J attributed the stock drop to the new information that *Reuters* had disclosed.  A0289-A0294:¶¶234-241. *See, e.g.*, A0290:¶235 (Center for Financial Research and Analysis LLC: "*Reporting surfaced today* alleging JNJ did not disclose to the FDA that asbestos had sometimes been found in its baby powder ingredients dating back to the 1970s."); A0291:¶236 (Wells Fargo: J&J shares are down approximately 10% after a *Reuters* Report "that suggests the company knew about asbestos in its baby powder for decades but never told the FDA."); A0293:¶240 (January 12, 2019 *Seeking Alpha* article: "[A]ccording to a *Reuters* review" of J&J's statements, some of the Company's messages "combat[ting] the talc issue *actually omit key details* regarding findings on talc and, in certain instances, are undermined by other evidence.").

Several of the analysts expressly commented on the fact that the *Reuters* Report contained new, never-before-seen information. *See, e.g.*, A0291-A0292:¶237 (Leerink analysts: "[D]ocuments cited in the [*Reuters*] article had *not been previously shared with the public*."); *id.* (Credit Suisse: "[T]he documents that the *Reuters* article cited may be reported to the public for the first time."); A0294:¶242 (February 14, 2019 *Seeking Alpha* article: "Reuters journalists left very little room for skepticism.... Documents highlighted in the Reuters report show that JNJ executives

were not only aware of numerous internal and external reports of asbestos in JNJ talc powders, but actively stifled the findings without remedy.").[7]

The reverberations reached the halls of government, too. Senator Patty Murray of Washington state demanded J&J produce documents relating to the Company's "'alleged decades-long'" cover-up unearthed by *Reuters*. A0296:¶248. Massachusetts Senator Edward Markey asked that the FDA "immediately investigate" the *Reuters* allegations and "determine whether Johnson & Johnson's actions have placed at risk the public's health and safety." A0295:¶245. And in February 2019, J&J disclosed that it had received preliminary inquiries and subpoenas from the United States Department of Justice and the Securities and Exchange Commission to produce documents regarding, *inter alia*: (i) this securities-fraud suit; and (ii) the safety of its talc-containing products. A0182:¶13.

Then, on October 16, 2019, the FDA informed J&J that it had found asbestos in Johnson's Baby Powder, leading to a recall of nearly 33,000 bottles and four major retailers pulling Johnson's Baby Powder from their shelves. ECF183:8. This was followed by a March 3, 2020 letter from Congressman Raja Krishnamoorthi to the FDA echoing the revelations from *Reuters*. *Id*. The Congressman emphasized J&J's "brazen attempts to cover up the presence of asbestos," and highlighted the

---

[7]  The Complaint contains a typo in the article's date, attributing it to "2018."

importance of preparing talc samples for testing by using a concentration method ("heavy liquid-separation")—going so far as to warn that legislation would be forthcoming if the FDA did not include such a method in its recommendations. *Id*. Shortly thereafter, on May 19, 2020, J&J announced it was discontinuing its talc-based powder in the U.S. and Canada. *Id*.

**B.    Key Procedural Events**

**1.    The district court denies most of Defendants' motion-to-dismiss arguments.**

In May 2019, Defendants moved to dismiss the operative Complaint.  ECF44. As the district court later recounted, Defendants argued that all of their alleged misstatements and omissions were immaterial, scienter hadn't been alleged with particularity, and Plaintiff hadn't sufficiently alleged loss causation.  A0453.

The district court denied Defendants' motion in large part.  While it agreed that Plaintiff hadn't adequately shown a strong inference of scienter as to some individual Defendants, and that Defendants' optimistic statements concerning the viability of certain product-liability lawsuits weren't actionable, the court held that Plaintiff's remaining allegations stated securities-fraud claims.  Going forward, Plaintiff's claims under §10(b) and SEC Rule 10b-5 would comprise

> those stemming from Defendants' statements regarding the safety of its talc products, the "asbestos-free" nature of its talc, and the Company's commitment to product safety, quality assurance, and research.

- 16 -

A0454.

Notably, in urging dismissal, Defendants advanced the same loss-causation argument that they repeat on appeal—albeit now repackaged as their no-price-impact argument:

> In Defendants' view, none of the alleged disclosures contain material information which was disclosed for the first time, rather, the identified disclosures merely proffer additional details about previously available information and do not constitute corrective disclosures.

A0513.  The district court rejected that argument, finding that although many of the disclosures addressed previously aired subject matters, nonetheless "*each provided new information* as to the seriousness and extent of the Company's alleged fraud." A0514.

As for Defendants' product-safety and quality-assurance statements, the district court observed that "[b]y placing the nature of the Company's quality[-]assurance procedures 'in play,' Defendants were also required to disclose 'certain facts contradicting th[ose] representations." A0485. The Complaint sufficiently alleged that Defendants hadn't—instead, utilizing "intentionally deficient" quality-assurance procedures, and deliberately avoiding "'essential' testing that might reveal the existence of asbestos" in J&J's talc products. A0485-A0486.

**2.    The class-certification Opinion reflects the district court's discretionary findings and conclusions after considering extensive briefing, copious record evidence, and opinions from the parties' dueling experts.**

The parties skirmished over class certification in May 2023, with the district court considering their initial briefing as well as several sur-replies and supplemental submissions. A0080. The materials easily spanned thousands of pages. *See generally* docket entries ECF180-ECF197.

Despite the voluminous materials submitted, the district court noted that Defendants challenged only one Rule 23 class-certification prerequisite: "[W]hether common questions of reliance *predominate* over questions affecting only individual class members." A0090; *see also* A0094 ("Defendants do not challenge market efficiency or whether Plaintiff is entitled to the [rebuttable] presumption" of reliance established in *Basic*).

Defendants thus assumed the burden of persuasion to rebut *Basic*'s reliance presumption by disproving price impact. A0094; *see also* A0103 (Defendants must "establish a *lack* of price impact" between disclosures and stock-price decline.) (court's emphasis); A0100 (price-impact "analysis turns on whether Defendants can 'sever the link' between" their misstatements "and the stock price by a preponderance of the evidence"). Defendants' attempted severing revolved around the premise—

- 18 -

repeated now on appeal—that *no* information communicated via the six alleged

disclosure events was "new" to the market, thus precluding the disclosures from

impacting J&J's inflated stock price.  A0095.

The district court rejected Defendants' price-impact arguments concerning each

of the six alleged disclosure events.  For purposes of this appeal, the court's

consideration of two disclosure events warrants greater discussion: (i) the $4.69

billion jury verdict in *Ingham*; and (ii) the Class Period-ending *Reuters* article whose

contents spurred a multi-billion-dollar stock drop.[8]

As to the former disclosure, while Defendants insisted the *Ingham* verdict

disclosed nothing "new" and the associated stock-price decline wasn't statistically

---

[8]    In addition to those two events, the district court also rejected Defendants' attempts
to disprove any price impact associated with the remaining four disclosures:
(1) Although the price decline associated with the September 27, 2017 Bernstein
Release wasn't at the "traditionally 'statistically significant' standard," Defendants
"have not identified another explanation for the price decline."  A0099.  (2) While the
January 30, 2018 Law360 article contained information overlapping with prior
articles, the court expressly found that "one piece of information [was] missing" from
those prior ones: a 1975 report in which another company "'allegedly said it found
asbestos'" in J&J powder.  A0099.  Defendants thus hadn't severed the link and the
court "*therefore finds*" that they hadn't rebutted the *Basic* presumption.  A0100.  (3,
4) The court similarly disputed Defendants' insistence that there was nothing "new" in
either the February 5 or February 7, 2018 disclosures discussing the *Lanzo* trial—
pointing to a trio of record facts: (i) the statistically significant stock declines
following both disclosures; (ii) reactions by news media, financial analysts, and J&J
employees themselves; and (iii) Defendants' failure to offer "any other explanation"
for the stock drops, including by their expert.  A0101.

significant (A0101), the district court disagreed.  It wasn't persuaded "that the verdict had *no* impact at all on the stock price."  A0102 (court's emphasis).  Indeed, whether the verdict itself was truly "corrective" wasn't a proper inquiry at the class-certification stage.  *Id*.  And the associated stock drop's 94.48% confidence level was "just shy" of the 95% commonly associated with statistical significance: "That, alone, is not enough to rebut the *Basic* presumption."  *Id*.

As to the *Reuters* Report disclosure event, the district court again "emphasize[d] that the burden is on Defendants to establish a *lack* of price impact between the disclosure and a stock price decline."  A0102-A0103 (court's emphasis).  "Defendants must 'sever the link'" between the two.  A0103.  But they had failed to do so.

While Defendants insisted that the *Reuters* allegations stemmed from claims made in several prior trials along with some 56 "'internal documents'" that were supposedly publicly available (A0103), the district court noted Plaintiff's countervailing evidence approvingly.  The Report actually contained "additional new pieces of information," including *Reuters*'s "'findings and analysis from its independent investigation.'"  *Id*. (citing ECF183:24-27).  In other words, it was partly the article's "*analysis* … that constitutes new information."  *Id*. (citing ECF183:32-33) (court's emphasis).  In addition, as Plaintiff had pointed out, the *Reuters* Report had kicked off a "'flurry of reaction'" within J&J, including a team of lawyers and

- 20 -

executives devoting days to crafting a response, along with an $8 million media-budget increase.  A0103-A0104 (citing ECF183:27).  Such actions would not be necessary if the *Reuters* Report "'was nothing but stale information.'"  A0104.

The district court allowed that the *Reuters* piece did reference some previously disclosed documents.  *Id*.  But that didn't mean those documents were equivalent to *Reuters*'s studied analysis.  *Id*.  Instead, *Reuters* had "'painstakingly annotated the various documents linked, explaining and providing necessary context.'"  *Id*.

At bottom, Defendants hadn't carried their burden: "Having reviewed *all of the evidence surrounding*" the *Reuters* disclosure, "the Court concludes that Defendants have not rebutted" the *Basic* presumption.  *Id*.  While Defendants' various arguments may have made it "less likely" that the disclosure impacted J&J's stock price, that lessened likelihood fell short of meeting their rebuttal burden: the district court expressly "finds that it does not suffice to rebut the presumption of price impact by a preponderance of the evidence."  *Id*.

The district court thus certified the class.  A0104-A0105.

## V.    STANDARD OF REVIEW

This Court reviews class-certification decisions for an abuse of discretion, "bear[ing] in mind '[t]he trial court, well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, *possesses broad*

- 21 -

*discretion* to control proceedings and frame issues for consideration under Rule 23.'"

*Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51, 52 (3d Cir. 2019) (alteration

in original).  An abuse of that broad discretion only occurs "if the district court's

decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law or

an improper application of law to fact.'"  *Grandalski v. Quest Diagnostics Inc.*, 767

F.3d 175, 179 (3d Cir. 2014).

## VI.    SUMMARY OF ARGUMENT

Under the broad discretion afforded it, complemented by findings fully

supported by the record, the district court correctly granted class certification.

A key part of that class-certification grant was the district court's holding that

Defendants failed to carry their burden of disproving, by a preponderance of the

evidence, *any* price impact on J&J's stock price from their Class Period

misrepresentations and omissions. *See*, *e.g.*, A0104 ("Having reviewed all of the

evidence surrounding" the blockbuster *Reuters* Report disclosure closing out the Class

Period, "the Court concludes that Defendants have not rebutted the presumption.").

Defendants' attempts to disprove price impact revolved around one central

premise—that each of the six "corrective disclosures" that impacted J&J's stock price

actually was composed of stale, previously-aired information already known to

investors. *See* Defs' Brf. at 18-62.  According to Defendants, in order for price impact

- 22 -

to exist, every piece of corrective information must be sparkling *new*—never aired previously, in any shape or form.

The district court considered Defendants' arguments and, even indulging their "newness" premise, nonetheless found that each of the six disclosure events illustrated an impact upon J&J's stock price that Defendants' hadn't been able to explain away. Especially as to the two disclosure events that feature in the appellate briefing—the *Ingham* multi-billion-dollar jury verdict, and the *Reuters* Report—the court found that the Defendants hadn't severed the link between disclosure and price impact. *See*, *e.g.*, A0104 (agreeing that *Reuters* undertook "'careful analysis'" of some previously-available materials, explaining them and "'providing necessary context'"); *see also* A1830 (after sifting through thousands of pages of previously confidential materials, *Reuters* asserts that "[m]uch of their contents is [being] reported here for the first time").

On appeal, Defendants continue pressing their "newness" premise—but they're wrong several times over.

First, the purported fount of that premise is nonexistent. Defendants argue that the Supreme Court in *Goldman Sachs* required that corrective disclosures showing price impact be composed of "new" information never before aired or even available (Defs' Brf. at 23-24), but their argument is specious. The opinion is silent as to a

- 23 -

disclosure's "newness," and mainly concerns itself with the possible "mismatch" between admittedly "generic" misstatements linked with "specific" corrective disclosures. *Goldman Sachs*, 594 U.S. at 119-20. That concern is absent here, where Defendants' misstatements concerning asbestos in J&J talc products were pointed and specific—and definitively linked with the contrary disclosures.

Second, Defendants are improperly dressing up as "price impact" the *loss causation* argument that they already raised—unsuccessfully—at the motion-to-dismiss stage. *See* A0514 (rejecting Defendants' argument that "the identified disclosures did not proffer 'new' information"). The Supreme Court has explained that while loss causation "is a familiar and distinct concept in securities law[,] *it is not price impact*." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 814 (2011) ("*Halliburton I*"). Nor is loss causation's presence (or absence) properly adjudicated at the class-certification stage. *Id*. at 813.

Third, Defendants are also disguising a related *truth-on-the-market* argument as their "price impact" one—with the result that they're again prematurely raising an argument that's not to be adjudicated at the class-certification stage. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013). While Defendants may one day attempt to show that the truthful asbestos-related news impacting J&J's stock

- 24 -

price had *previously* "'credibly entered the market and dissipated the effects'" of their prior misstatements, that undertaking "'is a matter for trial.'" *Id*.

Finally, this Court may affirm the district court's class-certification ruling on any grounds supported by the record. *Helvering v. Gowran*, 302 U.S. 238, 245 (1937). While the district court advanced several rationales and noted various record facts supporting its class-certification and price-impact rulings, the record contains additional evidence illustrating the correctness of those rulings.

For example, while analyzing price impact vis-à-vis the *Reuters* Report, the district court didn't even mention testimony from Plaintiff's expert pointing out demonstrably *new* information in that Report—including Defendants' own expert's concessions that there existed new information. A3957-A3958:¶46 &n.52. Nor did the court discuss J&J's internal memo acknowledging that the *Reuters* Report *had* impacted the Company's stock price (A4307), or that J&J deliberately (and carefully) tweaked its asbestos-related messaging in the Report's aftermath. And the court said nothing about the 10 analyst reports "specifically not[ing]" that the *Reuters* Report "caused the 14 December 2018 stock price decline"). A3964:¶63. In contrast, Defendants' suggestion that J&J's stock-price drops happened "coincidentally" with the corrective disclosures falls woefully short of disproving price impact.

This Court should affirm the class-certification ruling.

- 25 -

# VII. ARGUMENT

### A. Utilizing its findings that corrective information helped reveal Defendants' fraud to the market, the district court acted well within its discretion in holding that Defendants failed to carry their burden of disproving price impact.

The rule that lies at the heart of this class-certification appeal is straightforward: once plaintiffs have sufficiently invoked *Basic*'s rebuttable presumption of reliance, it is defendants who "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence." *Goldman Sachs*, 594 U.S. at 117; *see also id.* at 126 ("defendant must carry that burden by a preponderance of the evidence"). This exercise involves no "mere production" on defendants' part "of *some* evidence relevant to price impact." *Id.* at 126 (Court's emphasis). Instead, the Supreme Court holds—and has repeatedly emphasized—that in order to disprove price impact, defendants "must 'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff." *Id.* at 125-26 (alteration in original); *accord Halliburton II*, 573 U.S. at 281; *Basic*, 485 U.S. at 248.

As the district court found, Defendants failed to carry their burden and sever that link for a panoply of reasons. Plaintiffs tabulated those reasons *supra* §IV.B.2., and will briefly address them *infra*, but first it's important that the Court appreciate the faulty premise underlying their price-impact arguments that Defendants have concocted out of whole cloth.

**1.    Defendants have conjured up a false premise by claiming that *Goldman Sachs* requires corrective disclosures to be "new" when assessing price impact.**

The linchpin of Defendants' argument is that J&J's stock price *couldn't possibly* have reacted to any of the corrective disclosures because nothing in those disclosures was "new." *E.g.*, Defs' Brf. at 18-19, 23-24, 33-50. As with any linchpin, however, once it's removed the assembled mechanism collapses—and so it is here.

Defendants insist that the "new" criterion comes from the Supreme Court's recent *Goldman Sachs* decision, which Defendants say "put … to rest" a "significant debate about the manner and degree to which courts should scrutinize corrective disclosures at class certification."  Defs' Brf. at 22.  According to Defendants, *Goldman Sachs* addressed what makes a disclosure truly corrective, and concluded that it has to contain "new" information never before disclosed or available to the public.  Defs' Brf. at 23-24.

Defendants are dead wrong.

*Goldman Sachs* doesn't breathe a word about corrective disclosures having to be "new" in order to show price impact.  Yes, the decision addresses price impact at length while clarifying several concepts—but its holdings and rationales are all mum on the subject of "new" corrective information.  The opinion instead:

- holds that it is defendants' burden to disprove any price impact (*Goldman Sachs,* 594 U.S. at 117, 126);

- 27 -

- explains that "[t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact (*id*. at 126-27);

- clarifies that a district court considers *all* probative evidence on the question of price impact—both qualitative and quantitative, and aided by "'a good dose of common sense'"—when assessing price impact at class certification (*id*. at 122); and

- counsels that "[t]he generic nature of a misrepresentation often will be important evidence of a lack of price impact" (*id*. at 123).

It is that final bullet point that attracted much of the Supreme Court's attention in *Goldman Sachs*, for the matter involved admittedly "generic" misstatements that plaintiffs sought to link with some very "specific" corrective disclosures that drove down Goldman's stock price.  *Id*. at 119-20.  When there is a "mismatch" between generic misrepresentations and specific disclosures, the Court explained, "it is less likely that the specific disclosure actually corrected the generic misrepresentation."  *Id*. at 123.[9]

With all of the foregoing credited, this Court will search *Goldman Sachs* in vain for any discussion—nay, even a *hint*—of the notion that defendants have successfully disproved price impact if they're able to point to some aspect of a stock-moving

---

[9]  Because it was unclear "whether the Second Circuit properly considered the generic nature of Goldman's alleged misrepresentations in reviewing the District Court's price impact determination," the Supreme Court vacated and remanded.  *Id*. at 127.

disclosure that is not completely "new."  Defendants' "newness" prerequisite for price impact is illusory.

> **2.    Indulging Defendants' made-up premise, the *Reuters* Report contained new information that, when disclosed, contributed to J&J's plummeting stock price.**

Even if Defendants' price-impact-requires-"new"-information argument was colorably proper—which Plaintiff doesn't concede—the record demonstrates that the district court correctly decided, in its discretion, that the *Reuters* Report didn't comprise stale information.  Defendants' attempt to twist that record to satisfy their self-serving narrative of what was said, and how the market regarded it, fails.

For instance, Defendants cherry-pick several documents from the *Reuters* Report to argue that their contents were discussed previously, or were at least *available* on some obscure website.  *E.g.*, Defs' Brf. at 35-37, 38-39.  It's a futile undertaking, for at least five reasons.

First, as Plaintiff discusses more fully *infra* in §§VII.B.1.-2., Defendants have shirked their requisite price-impact burden and substituted in its place two *other* distinct analyses that securities-fraud defendants often undertake while arguing that corrective information isn't "new" to investors: loss causation and truth-on-the-market.  Those are both *merits* analyses, however, and neither is properly undertaken at the class-certification stage.  *See Halliburton I*, 563 U.S. at 813 (loss causation not

- 29 -

proper subject for class-certification resolution); *Amgen*, 568 U.S. at 482 (truth-on-the-market defense "is a matter for trial"). While *Goldman Sachs* allows that some "'overlap'" between price-impact and merits questions is allowable at the class-certification stage (594 U.S. at 122 & n.2), a full-blown merits adjudication remains improper. *Amgen*, 568 U.S. at 482.

Second, Defendants' gambit glosses over the district court's contrary, record-based reasoning that took into account their heavy burden to definitively disprove price impact—to "'sever the link' between the disclosure[s] and the stock price decline." A0103. "To satisfy this burden, Defendants must do more than produce evidence that is relevant to price impact." *Id*.

They did not.

While the court allowed that the *Reuters* article did reference previously disclosed documents, and that some of the "'56 linked documents'" had previously appeared on an obscure J&J website, that "'hardly compares to Reuters' careful analysis'" of the "'painstakingly annotated'" documents along with its explanations and provided context. A0104 (agreeing with Plaintiff); *see also* A0514 (court's prior ruling that "each [disclosure] provided new information as to the seriousness and extent of the Company's alleged fraud").

The district court was not acting as an outlier when it held that a neutral, independent investigator like *Reuters* that analyzed in one place formerly discrete, wide-flung facts had sufficiently communicated new information to the market about J&J's conduct.   A0104.   For instance, in *Pub. Emps.' Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014), the Fifth Circuit confronted a similar question—albeit in the loss-causation context—when it held that *The Wall Street Journal*'s reporting admittedly "'based on publicly available Medicare records'" nonetheless plausibly revealed new, corrective information to the market.   *Id*. at 323.   As the Court explained, "[w]hile it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, *it is plausible* that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace."   *Id*.   Other decisions are in accord.   *See*, *e.g.*, *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1186-87 (9th Cir. 2024) (short-seller's report plausibly revealed new, corrective information by synthesizing previously available information for the marketplace); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795 (9th Cir. 2020) ("A disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure.").

- 31 -

The circumstances here resemble *Amedisys*, *Genius*, and *BofI Holding*. Just like in those circuit-level decisions, ordinary reasonable investors in J&J stock may not have had the wherewithal to access the same "thousands of pages of company memos, internal reports, and other confidential documents" concerning J&J's talc that *Reuters* examined. A1830. Indeed, Defendants *themselves* insisted that their public statements about talc-and-cancer studies were the result of having to "sift[] through the weight of voluminous and complex scientific studies and draw[] an overall conclusion from them." ECF44-1:28.[10]

That's fine, for *Reuters* did much the same—digging up and sifting through records and accounts dating back to the 1990s, "'explaining and providing necessary context'" (A0104), while representing that "[m]uch of their contents is [being] reported here for the first time." A1830. The district court acted within its discretion in accepting *Reuters*'s representations.

Third, the various reactions to the *Reuters* Report, both public and private, help illustrate that its analysis and reportage had an impact on J&J's inflated stock price. Most dramatically, there was the stunning 10% stock-price drop following its

---

[10] Defendants have repeatedly emphasized that their statements involved "interpretations of *complex* scientific data." ECF44-1:24; *see also id*. at 25 ("whether J&J's talc contained asbestos … [is] a complex scientific question"); *id*. at 29 (similar).

4861-2289-8401.v1

publication.   Using an event study that controlled for market and sector factors, Plaintiff's expert concluded that the multi-billion-dollar stock drop was attributable to the *Reuters* news.   A3956:¶41 ("Clearly, the *Reuters* Report caused the significant price decline.").   Plaintiff's expert also correctly noted that Defendants and their expert had offered no event studies of their own that might explain away the drop.   A3947:¶12; A3949:¶18.   And, based on his economic analysis and event study, Plaintiff's expert specifically opined that: "[t]he *Reuters* Report contained new information that was corrective of the alleged misrepresentations and omissions." A3957:¶43.

Additional reaction-related facts help show that the information communicated by the *Reuters* Report was sufficiently "new" and impacted J&J's stock price.   As already noted *supra*, J&J's *own* reaction to the news is telling.   Add to that fact that savvy analysts linked the 10% stock drop with the *Reuters* Report (A0289-A0294:¶¶234-241), with several commenting on the information's newness.   *See, e.g.*, A0290:¶235 (Center for Financial Research and Analysis LLC: "*Reporting surfaced today* alleging JNJ did not disclose to the FDA that asbestos had sometimes been found in its baby powder ingredients dating back to the 1970s."); A0291:¶236 (Wells Fargo: the *Reuters* Report "suggests the company knew about asbestos in its baby powder for decades but never told the FDA"); A0291-A0292:¶237 (financial analysts

- 33 -

at Leerink note that "documents cited in the article had not been previously shared with the public"). That those analysts drew a direct line between the *Reuters* Report's contents and the impact upon J&J's stock speaks volumes, for securities analysts "'ferret out and analyze information.'" *Dirks v. SEC*, 463 U.S. 646, 658 (1983); *see also id*. at 658-59 ("information that the analysts obtain normally may be the basis for judgments as to the market worth of a corporation's securities").[11]

Fourth, the record demonstrates that the documents weren't as overtly public as Defendants portray. Take, for example, Defendants' lengthy exposition in Defs' Brf. at 35-37 concerning the damning draft changes to J&J's "Our Safety & Care Commitment" webpage from 2013. *See* A0235-A0237:¶¶126-128 (removing adjective "safe" from the "over 100 years" of safe use claim, and admitting "we cannot say 'always'[] asbestos free"). Because the document was an exhibit in the *Ingham* trial and used in CVN-broadcasted testimony, as well as posted on two websites, Defendants say, the *Reuters* Report could not have "'revealed'" it. Defs' Brf. at 35; *see also id*. at 36-37.

---

[11] Given that pointed analyst commentary, Defendants' insistence that there was a "'clear consensus' of securities analysts" that the *Reuters* Report revealed "no new information" (Defs' Brf. at 47) rings hollow. Moreover, Plaintiff shows *infra* §VII.C. that the purported "consensus" is illusory; even if it were debatable, that other analysts came down squarely on the "new" side of the ledger shows that Defendants have failed to carry their burden of completely severing any price-impact link.

- 34 -

Defendants are too clever by half.  As Plaintiff told the district court, the CVN broadcasts of trials are insufficient to show complete prior disclosure.  A3918.  CVN doesn't post or display *full* copies of trial exhibits.  *Id*.  And Defendants had failed to provide copies of any particular trial exhibits to compare against the *Reuters*-linked documents.  *Id*.

As for the two self-serving websites Defendants herald (Defs' Brf. at 37), they were suspect, too.  Addressing J&J's own "factsabouttalc.com," Plaintiff told the district court that J&J had conveniently dumped thousands of trial documents onto it *just two weeks* prior to the *Reuters* exposé—when Defendants already knew what *Reuters* had uncovered and was planning on reporting.  A3917.  Moreover, the dump was selective: J&J's upload of the draft website copy admitting they couldn't say J&J's talc-based products were "'always'" asbestos-free *had two pages missing*— including metadata revealing that the document was in Defendant Goodrich's own custodial files and had been created on October 10, 2013.  A3917 n.24.  And while Defendants claimed below—but don't dare now—that a November 15, 1972 report was uploaded to J&J's website, the Company's version contained only the first of *16 pages* linked by *Reuters*.  *Id.*[12]

---

[12]  Below, Defendants also tried to undermine the *Reuters* Report by referencing the same, second website they reference on appeal—the "asbestosandtalc.com" website.  Defs' Brf. at 37.  Plaintiff told the district court that while Defendants claimed myriad

In a last-ditch effort to defeat class certification, Defendants presented a declaration from Mark Lanier, lead trial lawyer in *Ingham*, "confirm[ing]" himself as a "'primary source'" for *Reuters* and stating that he only provided "publicly available" information. Defs' Brf. at 15, 35.[13] But on their face, such statements do not prove that *all* of the *Reuters* Report was stale information. Indeed, Lanier's *second* declaration (ignored throughout Defendants' briefing) admits the obvious: that his first declaration was limited to documents he had provided, and that he had "'no personal information' regarding 'additional source interviews or documents' provided to *Reuters*." A5114 (quoting Second Declaration of Mark Lanier, A5129-A5130:¶¶3-7). And even a cursory review of the *Reuters* Report reveals new, corrective information that could not have been provided by Lanier. *See supra* §IV.A.2 (identifying corrective information from sources other than Lanier).

In light of the foregoing, *Reuters*'s representation that its reporting flowed from formerly-confidential documents, with "[m]uch of their contents ... reported here for the first time" (A1830), warrants credence—as does the district court's discretionary

---

links to the website existed in articles, one book, and the Federal Register, in truth "all but one" link were from 2020, "over a year *after* the *Reuters* Report." A3918 (emphasis in original).

[13] Defendants say Lanier confirmed he was "*the*" primary source for the article (Defs' Brf. at 15), but that's incorrect. Lanier's declaration expressly states that he was "*a*" primary source. A5094-A5095:¶3.

acceptance of *Reuters*'s representations.  A0104.  There was no clear error in doing so.

Fifth, Defendants' exercise presumes that any prior *availability* of truthful information was pure and unsullied, and that its publication, however obscure, obliterates any price impact associated with that information's full airing.

That's a false presumption, however, especially on the record here.  The record shows that Defendants went to great lengths to deny asbestos contamination and obfuscate any clear picture when responding to damaging disclosures over the years. *See*, *e.g.*, A0364:¶350 (responding to news story about recent lawsuits, J&J claims on CNBC that "our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation dating back to the 1970s"); A0369:¶359 (J&J tells *New York Daily News* after the *Lanzo* trial's devastating verdict that "Johnson's Baby Powder has been used for more than 120 years and it does not contain asbestos ....").  Again and again, as Plaintiff's expert opined (while using specific examples), "the market was inundated with denials by J&J"—and importantly, "those denials were repeated by equity analysts."  A3965:¶65 & n.87.

Defendants' expert Kleidon, on the other hand, failed to consider whether J&J's confounding denials impeded the market's "appreciation and absorption of corrective information."  A3965:¶66, A3966:¶67 (Kleidon "admits that he neither investigated

whether the purported previous disclosures were accompanied by J&J denials, nor did he consider the effects of the Company's denials and countervailing arguments"); *see also* A4794/219:22-220:20 (during deposition, Kleidon concedes his failure to investigate whether prior public disclosures were accompanied by contemporaneous denials of wrongdoing by J&J).

J&J's repeated public denials matter. As this Court has explained: "Just as we require investors to act upon public information indicating fraud, so, too, do we allow them to rely upon corporate statements discounting the possibility of malfeasance." *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 350 (3d Cir. 2009) (holding that defendants' "reassuring statements operate as a sort of antidote" to contrary information); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992) (investors "'justifiably place[] heavy reliance on the statements and opinions of corporate insiders'"). Logically, it stands to reason that Defendants' repeated denials muddied the prior "truth" about asbestos in J&J's talc products. Just how much has not been established here, to be sure—but it's at least enough to agree that Defendants thus failed to carry their burden of severing *any* price impact by a preponderance of the evidence. *Goldman Sachs*, 594 U.S. at 117.[14]

---

[14] Defendants have hoisted themselves by their own petard by repeatedly emphasizing that an efficient capital market usually incorporates *all* publicly available information. By definition, that same efficient capital market incorporated each of

- 38 -

In sum, even accepting Defendants' linchpin premise that price impact can only be demonstrated by truly "new" corrective information—which premise Plaintiff doesn't concede—the district court's finding that the *Reuters* Report contained new information and analyses must be honored. *Reuters* itself explicitly noted that of the thousands of documents formerly "designated as confidential" and "shielded from public view," much of their contents was being "*reported here for the first time*." A1830; *see also* A0104 (district court agrees with Plaintiff that *Reuters* undertook a "'careful analysis'" of previously disclosed documents while "'explaining [them] and providing necessary context'").

Ultimately, "[h]aving reviewed all of the evidence surrounding" the *Reuters* Report, the district court expressly found "that Defendants have not rebutted the presumption." A0104. While Defendants' nothing-new arguments "may make it *less likely* that the disclosure impacted" J&J's stock price, ultimately "the Court finds that it does not suffice to rebut the presumption of price impact"—and certainly not "by a preponderance of the evidence." *Id*.

---

Defendants' confounding *denials* of asbestos contamination—thus setting the stage for a more-independent voice like *Reuters* to be heard by the market.

There is nothing erroneous, let alone clearly erroneous, about these findings that are amply supported by the record. Thus, the district court's discretionary class-certification holding stands. *Grandalski*, 767 F.3d at 179.

### 3. The *Ingham* verdict obviously impacted J&J's stock price, and Defendants failed to prove otherwise.

As to the effect of the multi-billion-dollar *Ingham* trial verdict, the district court wasn't persuaded by Defendants' argument "that the verdict had *no* impact at all on the stock price." A0102 (court's emphasis).

The district court noted Defendants' concession that *Ingham* was the first jury trial where injured plaintiffs alleged that the *asbestos* in J&J's talc had caused their cancer, and so agreed with Plaintiff that the verdict "'constitutes new fraud-related information.'" *Id.* (citing ECF183:39); *see also* A3683:¶46 (Defendants' expert acknowledges: "The first lawsuit verdict against J&J over an alleged link between its Talcum Powder Products, asbestos, and ovarian cancer was the *Ingham* Trial …."). The court thus couldn't say that the verdict "had *no* impact at all on the stock price." A0102 (court's emphasis).

Defendants nonetheless insist that the only "new" information in the *Ingham* verdict was that "one particular jury" had sided with plaintiffs and awarded "an astronomical amount." Defs' Brf. at 51. That insistence ignores a key record fact: *Ingham* was the first jury trial focused on the asbestos in J&J's talc. A0102. As

- 40 -

Plaintiff's expert explained, the verdict thus represented "among other things, a vetting of allegations and contested information." A3972:¶88. Importantly, Defendants' expert failed to identify any other J&J-specific news that could have caused the stock drop. A3973:¶91.

Nor could the district court accept Defendants' argument that the verdict didn't comprise a corrective disclosure. *Id.*; A0515 n.8 (The court had already ruled against Defendants' identical argument on their motion to dismiss, finding that they hadn't cited *any* cases holding that "a jury verdict cannot, as a matter of law, constitute the disclosure of new information.") At the class-certification stage, whether the verdict was truly "corrective" wasn't a proper inquiry. A0102 (citing cases); *see also Halliburton I*, 563 U.S. at 813 (2011) (loss causation not proper subject for class-certification resolution).

The district court also rejected Defendants' argument that the resulting stock-price movement wasn't statistically significant. A0102. The evidence showed a 94.48% confidence level, which was "just shy" of the usual 95% associated with statistical significance: "That, alone, is not enough to rebut the *Basic* presumption." *Id.*; *see also Vizirgianakis*, 775 F. App'x at 53 (agreeing that a lack of statistically significant price movement doesn't mean there is no price impact); *see also* A3952:¶26 (Plaintiff's expert: "a price reaction that is not statistically significant at

- 41 -

the 95% confidence level *does not disprove* that certain information had price impact").

"Looking at the evidence altogether," the district court couldn't agree that Defendants had rebutted the presumption.  A0068.[15]  As with the court's *Reuters* analysis, its findings and reasoning relating to the *Ingham* verdict were amply supported by both the record and precedent.  The court's discretionary class-certification conclusion stands.

> **B.    Defendants' price-impact arguments actually are thinly-veiled loss-causation and truth-on-the-market arguments—both "merits" inquiries that are not properly adjudicated at the class-certification stage.**

> **1.    Defendants' loss-causation defense cannot be decided at the class-certification stage.**

In order "[t]o prevail on the merits in a private securities fraud action, investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss."  *Halliburton I*, 563 U.S. at 807; *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (private securities-fraud plaintiffs must "adequately allege and prove the traditional elements of causation and loss").  "This requirement is commonly referred to as 'loss causation.'"  *Halliburton I*, 563 U.S. at 807.

---

[15]  That evidence included the fact that Defendants' expert could not identify any other Company-specific information that day that would have caused the stock drop. A3973:¶91, A3974:¶93.

- 42 -

"Loss causation," however, is *not* "price impact."

In a securities-fraud action "'[p]rice impact' simply refers to the effect of a misrepresentation on a stock price." *Id*. at 814. It is that perceived impact on a stock's market price that allows plaintiffs to avail themselves of *Basic*'s reliance presumption. *Id*. at 812; *Basic*, 485 U.S. at 247 ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.").

The element of loss causation, "by contrast, requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton I*, 563 U.S. at 812 (Court's emphasis). And so while loss causation "is a familiar and distinct concept in securities law[,] *it is not price impact*." *Id*. at 814.

The two concepts differ materially in another key manner, as well.

As to price impact, it's understood that the requirement is fair game for adjudication at class certification, and needn't be confined to the merits stage. *Halliburton II*, 573 U.S. at 283. Indeed, that a misrepresentation was reflected in a stock's market price "has everything to do with the issue of predominance at the class certification stage." *Id*. And so, defendants hoping to defeat *Basic*'s reliance

- 43 -

presumption assume the burden—usually at the class-certification stage—of attempting to *disprove* price impact. *Goldman Sachs,* 594 U.S. at 117 ("our precedents require defendants to bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence"); *accord id*. at 126.

In contrast, requiring that plaintiffs prove loss causation at the class-certification stage is *verboten*. That's because

> [t]he fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation *has nothing to do with whether an investor relied on the misrepresentation* in the first place, either directly or presumptively through the fraud-on-the-market theory.

*Halliburton I*, 563 U.S. at 813. In contrast with the exercises of showing—or disproving—price impact as part of *Basic*'s reliance-presumption inquiry, "[l]oss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory." *Id*. Thus, there's no place at the class-certification stage for using the existence (or absence) of loss causation as a proxy for the separate concept of price impact. *Id*. at 813-15.

The district court here correctly noted it didn't have to consider loss causation at the class-certification stage (A0090), and elsewhere reiterated that "[a]gain, … the Court need not determine whether the disclosures are corrective at this stage." A0101. That said, the court noted, it *did* have to "determine whether Defendants have met their burden to sever the link between the disclosures and the price impact." *Id*. (As

- 44 -

shown *supra*, the court correctly answered that determination in the negative.) Plainly, the court understood the distinction between loss causation and price impact.

But that same distinction eludes Defendants.

Without using the term "loss causation," Defendants nonetheless demand that Plaintiff prove that element at the class-certification stage. They repeatedly insist that for a truthful disclosure to be truly "corrective," the information disclosed must be *new* to the market, and never have been available to investors previously. *See*, *e.g.*, Defs' Brf. at 18-19, 23-24, 33-50. Their insistence harkens to a standard feature of loss-causation analysis, where to satisfy that securities-fraud element the alleged corrective disclosures must reveal something "new" to the market.[16]

Having set that scenario as their premise, Defendants then make the leap to arguing that unless a corrective disclosure is patently "new," it cannot conceivably have affected J&J's stock price. *See*, *e.g.*, Defs' Brf. at 23 (no price impact when disclosure "Contains No New, Corrective Information").

Defendants are thrice wrong.

First, Defendants already made that same loss-causation argument at the motion-to-dismiss stage, and were promptly shot down by the district court. A0514

---

[16] *See*, *e.g.*, *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011); *see also FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1312 (11th Cir. 2011).

(rejecting "Defendants' contention that the identified disclosures did not proffer 'new' information").  Dressing up the contention now as "price impact" doesn't resurrect the point, or overcome the district court's finding—both at the motion-to-dismiss stage, and again at class certification—that new information was indeed communicated by the corrective disclosures.

Second, while Defendants try to shoehorn the idea of requisite "newness" into a price-impact argument, their supposed authorities actually magnify that tactic's impropriety.  For instance, Defendants cite *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013) for its observation that plaintiffs embracing the efficient-market theory must "'take the bitter with the sweet'" and cannot embrace market efficiency for only certain purposes (Defs' Brf. at 25)—but omit that *Meyer* was addressing *loss causation*.  (710 F.3d at 1199).  Making a similar point, Defendants say that this Circuit holds that securities plaintiffs can't "'have it both ways' with market efficiency" (Defs' Brf. at 25-26), but the two opinions they feature discussed that notion while analyzing *materiality*—a merits-based question.  *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269-70 (3d Cir. 2005) (discussing materiality of disclosures vis-à-vis stock movements); *see also In re Ocugen, Inc. Sec. Litig.*, 2024 WL 1209513, at *3-*4 (3d Cir. Mar. 21, 2024) (because allegedly damaging information was "readily available to any reasonable investor," its disclosure wouldn't have

"significantly altered the mix of information" available to reasonable investors). Even when grudgingly conceding there exist "rare" cases in which a later analysis can morph prior publicly available information into something "new" (Defs' Brf. at 44), Defendants *again* use inapposite loss-causation decisions. Defs' Brf. at 44-45 (citing *Amedisys*, 769 F.3d 313, and *Genius Brands*, 97 F.4th 1171). None of Defendants' decisions comparing "new" information with previous disclosures deals with price impact; indeed, none even mentions the concept.

Finally, Defendants conspicuously avoid discussing *Halliburton I*, which analyzed at length the distinction between "price impact" and "loss causation" while holding the latter needn't be proven at the class-certification stage. 563 U.S. at 813-15.[17] That deliberate avoidance by Defendants is telling, and cannot save their misguided, premature loss-causation arguments disguised as price-impact ones.

### 2. Defendants' truth-on-the-market defense cannot be decided at the class-certification stage.

In securities litigation, the term "truth-on-the-market" refers to the argument employed by defendants seeking to establish that news of the allegedly undisclosed truth(s) "'credibly entered the market and dissipated the effects'" of their prior

---

[17] Defendants cite *Halliburton I* elsewhere in their brief, but only for the truism that "[r]eliance is crucial" to the connection between misrepresentations and injuries. Defs' Brf. at 19.

misstatements. *Amgen*, 568 U.S. at 482 (quoting *Basic*, 485 U.S. at 249). Where applicable, the defense is a powerful weapon in a securities-fraud defendant's arsenal—for it can be used to rebut the fraud-on-the-market's presumption of reliance. *Id.*

There's one caveat to wielding that weapon, however: the Supreme Court has "emphasized" that presenting *proof* of a truth-on-the-market scenario to rebut *Basic*'s reliance presumption "'is a matter for trial.'" *Id.*; *see also Basic*, 485 U.S. at 249 n.29.[18] That's because analyzing truth-on-the-market is a merits-based inquiry common to the class overall, and "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 465. Thus, it's settled that a truth-on-the-market defense is not properly adjudicated at the class-certification stage. *Id.*; *accord Basic*, 485 U.S. at 249 n.29.

That truism distinguishes the truth-on-the-market defense from the no-price-impact defense, despite the fact that *both* are mechanisms that may be available to rebut *Basic*'s presumption of classwide reliance—but it comes down to a question of timing: only the latter may be advanced now, at the class-certification stage

---

[18]    In addition to saving it for trial, the truth-on-the-market proof "presumably" may be used "for a summary-judgment motion." *Amgen*, 568 U.S. at 482.

(*Halliburton II*, 573 U.S. at 284); the former must await trial (or summary judgment). *Amgen*, 568 U.S. at 482.

And yet that premature truth-on-the-market defense is precisely what Defendants advance here.[19]  Despite avoiding the term, their Opening Brief is saturated with the construct that unless the corrective disclosures contained fresh, "new" information that was never before aired in any forum—no matter how obscure or hard-to-find—those disclosures couldn't possibly have impacted J&J's stock price because the truth was already known. *See* Defs' Brf. at 18-62.  Their expert did the same thing below.  *See* A3954:¶31 (as to the disclosure dates he examined, Defendants' expert based his no-price-impact opinion "on his assertion that 'the allegedly concealed information … was publicly available prior to those dates'").[20]

---

[19]  Plaintiff respectfully disagrees with the district court's assertion that Defendants were not arguing about the "'truth' of the information" in the disclosure events. A0093.  That the "truth" supposedly had previously been aired formed the core of Defendants' arguments—both below and now in this Court.  Additionally, Plaintiff disagrees with the court's suggestion that Plaintiff "appears to concede" its Reply Brief's arguments against the availability of truth-on-the-market.  A0094 n.3.  The court was mistaken: in a letter responding to Defendants' post-*Goldman Sachs* supplemental argument (ECF123-ECF124) Plaintiff merely acknowledged *Goldman Sachs*'s clarification that "*all* relevant evidence" is assessed when considering the burden of disproving price impact.  ECF126:1.  Plaintiff's response never conceded its rebuttal to Defendants' camouflaged truth-on-the-market gambit.

[20]  For some reason, Kleidon examined and opined upon just four of the six disclosure dates.  A3954:¶31.

- 49 -

Defendants' premature gambit cannot be countenanced at this stage. *Amgen*, 568 U.S. at 482. It is—to use their own words—a "distortion of both class action and securities law." Defs' Brf. at 1.

At bottom, a proper analysis of "price impact" considers whether a defendant's misrepresentations (or omissions) *had an effect* upon the company's stock price. *Halliburton I*, 563 U.S. at 814 ("'Price impact' simply refers to the effect of a misrepresentation on a stock price."). It doesn't ask whether the related disclosure event is brand-spanking-new, or if some discrete facts may have been previously aired—however obviously or opaquely. And it recognizes that securities-fraud defendants have the burden to *disprove* that effect—to "sever[] [that] link" between misrepresentations/omissions and stock price (*Halliburton II*, 573 U.S. at 269)— before they've successfully rebutted the presumption of classwide reliance.

That didn't happen here. Because Defendants offered no explanation for J&J's stock movements, other than asserting that all information included in each disclosure event was already known to the market, they've failed to disprove price impact.

### C.    This Court may affirm the class-certification decision on myriad grounds contained in the record.

It is axiomatic that the district court's class-certification ruling may be affirmed on any grounds supported by the record. *See, e.g.*, *Helvering*, 302 U.S. at 245 ("if the decision below is correct, it must be affirmed, although the lower court relied upon a

wrong ground or gave a wrong reason"); *Erie Telecomm., Inc. v. City of Erie*, 853 F.2d 1084, 1089 (3d Cir. 1988) ("We affirm, although we do so on a ground that differs from the ground upon which the district court relied."); *accord Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1145 n.1 (3d Cir. 1983).

Here, even if the Court were to disagree with the precise reasons the district court discussed while holding that Defendants failed to disprove price impact, the record contains copious materials supporting that ultimate holding—even if the district court's Opinion did not allude to them.

For instance, in connection with its core *Reuters* Report analysis, the district court doesn't mention the testimony of Plaintiff's expert Steven Feinstein (who opined that the *Reuters* Report revealed new, corrective information), but his expert testimony and analysis eviscerates Defendants' price-impact arguments. In particular, on rebuttal, Feinstein pointed out the facts fatally undermining Defendants' no-new-information argument; among them were:

- Although Defendants claimed there was a "'consensus'" among analyst reports published in the *Reuters* Report's wake that it had raised no new factual issues, that consensus is illusory: (i) none of the analysts had previously referenced or analyzed the 56 documents Defendants' expert Kleidon heralded as forming the basis for the *Reuters* Report; and (ii) some of them had simply parroted "*J&J's perspective* that the *Reuters* article contained no new news." A3959:¶50; *see, e.g.*, A3959-A3960:¶51 (Credit Suisse clarifies that "'*according to J&J*'" the documents were previously publicized, and "'[J&J] believe[s] that there is no new information'"); *see also* A3792 (Citi notes that J&J "refutes"

the article's premise while also claiming that none of the information is "actually new").

- Relatedly, Defendants' expert conceded he didn't try to determine whether any of the *other* analysts had spoken to J&J before publishing their reports. A3960:¶52.

- Notably, Defendants' expert focused on whether (in Defendants' view) the *Reuters* Report contained "new value-relevant information" (A3956:¶42)—but "offered no opinion about price impact generally, *and certainly no opinion*" that Defendants' misrepresentations and omissions had not impacted J&J's stock price. A3947:¶12.

Similarly, the district court omits from its *Reuters* price-impact analysis a key concession by Defendants' expert—*i.e.*, that there *was* "new" information in the *Reuters* Report.[21] Among the conceded new information pieces were the facts that mineralogist Arthur Langer: (i) had found asbestos in Johnson's Baby Powder; (ii) was visited by J&J lawyers in 2017; and (iii) then told them "'that he stood by all of his findings.'" A3957:¶46. Defendants' expert Kleidon admitted that "'as far as I know, that piece of information was not public prior to the Reuters article.'" *Id*.[22]

---

[21] The court alluded earlier to the defense expert's admission, but only in passing while describing Plaintiff's general arguments. A0083.

[22] Rather than disclosing that Dr. Langer had *privately* told J&J lawyers in 2017 that he stood behind his findings of asbestos in J&J's Baby Powder, J&J actively concealed this information and made misleading statements about Dr. Langer's findings. For example, J&J lawyers told the jury in the July 2018 *Ingham* trial that Dr. Langer's findings were "a false alarm," and even insinuated that Dr. Langer had retracted his findings: "the FDA and Mount Sinai Hospital, which is where Dr. Langer was from, ... all concluded that there was no asbestos in any of the talc." A5142/832:17-22, A5144/834:1-7. These false and misleading statements were not

- 52 -

Likewise, while Kleidon's opinion about the *Reuters* Report focused on 56 "Allegedly Concealed Documents" (A3957:¶44), *Reuters* also reported information that it expressly attributed to other sources—like the American Cancer Society, an FDA Commissioner, Darlene Coker's attorney, and even J&J's own attorney.  A3957:¶46. Thus, even Kleidon "recognized that the *Reuters* Report contained information beyond the 'Allegedly Concealed Documents.'"  A3958:¶46 & n.52.

Nor did the district court mention two other pieces of damning evidence related to the *Reuters* Report: (i) that J&J itself acknowledged internally at the executive-suite level that the *Reuters* Report *had* impacted J&J's stock price (A4307 (internal memo states that "article published by Reuters on Talcum powder led to a 10% stock decline and a $40 billion market cap loss")); and (ii) that J&J consciously altered its asbestos messaging in the Report's wake, by tweaking its "What we knew" advertisement that formerly had insisted its Baby Powder "*never*" contained asbestos—now carefully stating that J&J's Baby Powder "*does not*" contain asbestos.   A4498/181:24-A4499/185:6.

Finally, while Defendants argued *ad nauseam* in the district court—and continue to argue on appeal—that there cannot be any price impact absent a truly

---

corrected until the *Reuters* Report accurately reported that Dr. Langer had privately told J&J lawyers in 2017 "that he stood by all of his findings."  A0200-A0201:¶61 & n.8; *see also* A1837.

"new" stock-price-moving disclosure, one intractable fact remains: Defendants *have never put forth their own countervailing explanation*, whether via an event study or expert testimony, explaining away the obvious impact on J&J stock associated with the *Reuters* Report. That's a fatal omission. *Goldman Sachs,* 594 U.S. at 117 ("our precedents require defendants to bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence").

Perhaps ruing that omission, Defendants now suggest that J&J's Class Period stock drops happened "coincidentally" with the corrective disclosures. Defs' Brf. at 24-25. Especially as to the dramatic post-*Reuters* 10% plunge, however, that suggestion of mere coincidence is both unfounded and unsupported by record evidence. It's also directly contradicted by J&J's own internal admissions (A4307), as well as by analysts following the Company. *See supra* §IV.A.2. (describing several analyst reports attributing stock drop directly to the *Reuters* Report's publication); *see also* A3964:¶63 (tabulating 10 analyst reports "specifically not[ing]" that *Reuters* Report caused stock-price decline). Those attributions cannot be ignored. *Dirks*, 463 U.S. at 658 (securities analysts "'ferret out and analyze information'").

The foregoing comprises just a sample of extensive record evidence that, while not mentioned by the district court, more than supports its holding that Defendants

failed to carry their burden of disproving price impact.  Affirmance remains proper.

*Erie Telecomm.*, 853 F.2d at 1089.

## VIII.  CONCLUSION

This Court is considering a simple question: did the district court act within its discretion when, given the benefit of full briefing and a voluminous record, it certified the class after concluding that Defendants had failed to carry their burden of *disproving* price impact by failing to sever the link between their fraud and J&J's statistically significant stock-price movements?

The answer is a resounding "Yes"—and so this Court should affirm.

DATED:  September 9, 2024          Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
JOSEPH D. DALEY
HARINI P. RAGHUPATHI


*s/Joseph D. Daley*
JOSEPH D. DALEY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
joed@rgrdlaw.com
hraghupathi@rgrdlaw.com

4861-2289-8401.v1

CARELLA, BYRNE, CECCHI,
  BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com

*Lead Counsel for Plaintiff-Appellee San
Diego County Employees Retirement
Association and Lead Counsel for the Class*

- 56 -

# CERTIFICATE OF COMPLIANCE WITH L.A.R. 28.3(d)

Joseph D. Daley, whose name appears on Plaintiff-Appellee's Answering Brief, hereby certifies that he is a member of the bar of the United States Court of Appeals for the Third Circuit.

I understand that a material misrepresentation may result in the Court's striking the brief and imposing sanctions.

*s/Joseph D. Daley*
JOSEPH D. DALEY

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(5), (a)(7)(B) AND (f) AND L.A.R. 31.1(C)

1.      This brief complies with the type-volume limitation of Rule 32(a)(7)(B) because the brief contains 11,986 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because the brief was drafted in Microsoft Word 2016, using 14-Point Times New Roman font.

3.      The text of the electronic brief is identical to the text in the paper copies.

4.      The virus detection program, Crowdstrike 7.16.18605.0, has been run on the file and no virus was detected.

I understand that a material misrepresentation may result in the Court's striking the brief and imposing sanctions.

*s/Joseph D. Daley*

JOSEPH D. DALEY

4861-2289-8401.v1

<u>DECLARATION OF SERVICE</u>

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    I hereby certify that on September 9, 2024, I electronically filed the foregoing document: PLAINTIFF-APPELLEE'S ANSWERING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

3.    I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 9, 2024, at San Diego, California.

*s/Joseph D. Daley*
JOSEPH D. DALEY
